[No. S060985. Mar. 26, 1998.]

VALLEY MEDICAL TRANSPORT, INC., Plaintiff and Respondent, v. APPLE VALLEY FIRE PROTECTION DISTRICT et al., Defendants and Appellants;
COUNTY OF SAN BERNARDINO et al., Defendants and Respondents.

748

## COUNSEL

William D. Ross, Lisabeth D. Rothman, Stream & Stream, Theodore K. Stream, David D. Werner, Theresa Han Savage and Fred C. Hernandez for Defendants and Appellants.

Paul Nicholas Boylan as Amicus Curiae on behalf of Defendants and Appellants.

Brunick, Alvarez & Battersby, Steven M. Kennedy, Foley, Lardner, Weissburg & Aronson, R. Michael Scarano, Jr., and Howard W. Cohen for Plaintiff and Respondent.

Alan K. Marks, County Counsel, and Alan L. Green, Deputy County Counsel, for Defendants and Respondents.

Douglas C. Holland, County Counsel (Monterey), William K. Rentz, Deputy County Counsel, Hanson, Bridgett, Marcus, Vlahos & Rudy, Craig J. Cannizzo and Robert L. Rusky as Amici Curiae on behalf of Defendants and Respondents.

Ruth Sorensen as Amicus Curiae on behalf of Plaintiff and Respondent and Defendants and Respondents.

OPINION

**MOSK, J.**—The roles of the state and its various political subdivisions in controlling emergency medical services are governed by the Emergency Medical Services Systems and the Prehospital Emergency Medical Care Personnel Act (the EMS Act). (Health & Saf. Code, § 1797 et seq.; all further statutory references are to this code unless otherwise indicated.) Of particular relevance to this case is section 1797.201, which authorizes a city or fire district that provided or contracted for prehospital emergency medical services (hereafter sometimes EMS) as of June 1, 1980, to continue to administer such services until it reaches an agreement with the county regarding the provision of such services.[1] In the recent case of *County of San Bernardino* v. *City of San Bernardino* (1997) 15 Cal.4th 909 [64 Cal.Rptr.2d 814, 938 P.2d 876] (*County of San Bernardino*), we considered, inter alia, whether a city or fire district authorized to administer certain emergency medical services under section 1797.201 may expand into other areas of service, specifically ambulance services, that it had not previously operated. We concluded that it may not do so.

We now consider whether the Apple Valley Fire Protection District (District), which had operated ambulance services as of June 1, 1980, but subsequently abandoned such services and permitted them to be provided by an ambulance company authorized by San Bernardino County (the County), has the statutory prerogative, several years later, to unilaterally resume these services and displace the County-authorized provider. The Court of Appeal concluded that, while the fire district did indeed have such a statutory right, it was equitably estopped from asserting that right because of its failure to apprise the County when it relinquished ambulance services that it was

---

[1]Section 1797.201 states in full: "Upon the request of a city or fire district that contracted for or provided, as of June 1, 1980, prehospital emergency medical services, a county shall enter into a written agreement with the city or fire district regarding the provision of prehospital emergency medical services for that city or fire district. Until such time that an agreement is reached, prehospital emergency medical services shall be continued at not less than the existing level, and the administration of prehospital EMS by cities and fire districts presently providing such services shall be retained by those cities and fire districts, except the level of prehospital EMS may be reduced where the city council, or the governing body of a fire district, pursuant to a public hearing, determines that the reduction is necessary. [¶] Notwithstanding any provision of this section the provisions of Chapter 5 (commencing with Section 1798) shall apply."

considering resumption of the services at some point in the future. We conclude that the Court of Appeal was correct in result, but for a different reason. We hold that section 1797.201 does not authorize a resumption of administration of emergency medical services once a city or fire district has abandoned those services and voluntarily permitted them to be replaced by the county or a county provider. Accordingly, because the District has no statutory right to resume ambulance services, we need not reach the question of equitable estoppel.

## I. FACTUAL BACKGROUND

Most of the relevant facts are not in dispute. As of June 1, 1980, the primary provider of ambulance services in the Apple Valley area was the predecessor in interest of plaintiff Valley Medical Transport, Inc. (Valley), McCormick Ambulance Service (McCormick). The District had a "rescue squad" vehicle, unit 4675. Unit 4675 was capable of functioning as an ambulance, and the District did occasionally use it to provide ambulance services, although generally only if a McCormick ambulance was not available. The District also provided emergency medical services consisting of "first responder" basic life support.

Following the passage of the EMS Act, the County entered into a joint powers agreement with Inyo and Mono Counties by which they created the Inland Counties Emergency Medical Agency (ICEMA).[2]

In 1984, the Legislature amended the EMS Act so as to permit a local EMS agency to create exclusive operating areas for EMS providers. (§ 1797.224, added by Stats. 1984, ch. 1349, § 3, p. 4779.) Thereafter, the County Board of Supervisors authorized the County's health officer, Dr. George Pettersen, to draft the transportation element of the County's local EMS plan (the Transportation Plan). Dr. Pettersen consulted with the County's Emergency Medical Care Committee (see §§ 1797.270-1797.276) and kept it advised throughout the drafting process. The Emergency Medical Care Committee was comprised of representatives of all the different types of emergency medical service providers, including hospitals, physicians, nurses, paramedics, fire chiefs, cities, and teaching institutions. Each member was expected to report back to his or her constituents. The District and its officials apparently took no formal part in the planning process.

---

[2]Because ICEMA's governing board is also the County's board of supervisors, we will refer to these entities interchangeably. (See *County of San Bernardino, supra,* 15 Cal.4th 909, 921, fn. 1.)

On November 13, 1984, the District's board of directors declared unit 4675 surplus and directed that it be sold. There was contradictory testimony with respect to whether the District held a public hearing on this decision. In place of unit 4675, the District purchased a new rescue squad vehicle, unit 4680, which had no gurney and therefore no patient transport capacity. In other words, the District had ceased to operate ambulance services. It continued to provide "first responder" basic life support.

In 1985, the County adopted the Transportation Plan. It divided the County into exclusive and nonexclusive operating areas, and assigned providers of ambulance services to each. To the extent possible, it assigned existing providers to the areas where they were already operating. It "grandfathered in" any entity, public or private, that had been providing ambulance services continuously since January 1, 1981. (See § 1797.224.) On this basis, it assigned to Valley exclusive operating area No. 12, and included the Apple Valley area in the District's jurisdiction. It had not assigned any operating area to the District because it was not providing ambulance services.

ICEMA submitted the Transportation Plan to the state Emergency Medical Services Authority (the Authority) for approval, as required (see § 1797.224), and in December 1985 the Authority approved it.

The District was aware of the Transportation Plan, and from 1986 through 1993, it let Valley keep its ambulances and personnel in District fire stations. Around 1994, allegedly after some complaints about the quality of Valley's services, the District began to consider providing its own ambulance services. On May 12, 1994, it enacted an ordinance declaring itself the exclusive provider of emergency ambulance services within its boundaries.

The Transportation Plan required Valley to serve not only Apple Valley, but also the unprofitable area of Needles. Valley could not profitably serve the exclusive operating area if it did not include Apple Valley. Accordingly, the County and ICEMA believed the District's assertion of an exclusive right to provide ambulance services in Apple Valley threatened the integrity of the local EMS system, and interrupted the systematic provision of emergency medical services.

## II. PROCEDURAL BACKGROUND

On July 13, 1994, Valley filed a complaint against the District and its board of directors, the County, and ICEMA, including causes of action for declaratory and injunctive relief.[3]

The case was tried to the court, with an advisory jury. On April 26, 1995, the jury returned a special verdict finding that: (1) on June 1, 1980, the District was providing ambulance services; (2) in 1985, the District was not aware of the County's creation of a Transportation Plan that established exclusive operating areas for providers of ambulance services; and (3) when the District disposed of its only ambulance, it abandoned its role as a provider of ambulance services.

On August 21, 1995, the trial court issued a statement of decision (Code Civ. Proc., § 632) recapitulating the jury's findings, and finding additionally that the District was aware of the Transportation Plan shortly after it was adopted and did not object to it. It ruled that Valley was the sole provider of ambulance services in the exclusive operating area, and it enjoined the District from providing ambulance transport services within that exclusive operating area.

On September 5, 1995, the District filed a motion for reconsideration. (Code Civ. Proc., § 1008.) On October 2, 1995, the trial court rendered judgment in accordance with its statement of decision. On October 5, 1995, in response to the District's motion for reconsideration, it amended its statement of decision so as to add an express finding that the District had abandoned its role as a provider of ambulance services in 1984.

The District appealed. In pertinent part, the Court of Appeal affirmed the judgment, holding that the District was equitably estopped from asserting a right to resume ambulance services. It concluded that, at the time the Transportation Plan was adopted, the District had misled the County because it had secretly harbored the reservation that it might wish to reassert its right

---

[3]Although the County and ICEMA are named as defendants in this case, they are in fact aligned with plaintiff Valley, and Valley's brief is submitted by the San Bernardino County Counsel. As county counsel explains in his brief: "To clarify the role of the County and ICEMA with regard to the present action, although named as defendants with . . . Apple Valley Fire Protection District, the role of the County and ICEMA as 'defendants' is in name only. With the exception of an isolated issue as to whether the District could upgrade its level of service to include paramedic functions, the County and ICEMA have supported the position of Plaintiff . . . , Valley Medical Transport Services, throughout the present action, and concur with the decisions of the lower courts in this matter."

to operate ambulance services. It further concluded that the County detrimentally relied on this nondisclosure by drafting and implementing a Transportation Plan premised on Valley being the exclusive ambulance provider in the area covered by the District.

After the Court of Appeal decision, we filed our opinion in *County of San Bernardino, supra,* 15 Cal.4th 909, in which we clarified a number of aspects of the relationship between counties and cities and fire districts under the EMS Act. We granted review in this case to further clarify this area of the law. In our order granting review, we stated: "In addition to the issue of equitable estoppel, the parties are directed to brief the issue of whether . . . section 1797.201 authorizes a fire district that operated ambulance services on June 1, 1980, but subsequently discontinued such services, to resume ambulance services without the consent of the local Emergency Medical Services agency."

### III. DISCUSSION

The proper starting point for the resolution of this case is an understanding of the EMS Act. As we recently explained, "the EMS Act contain[s] 100 different provisions in 9 separate chapters and create[s] a comprehensive system governing virtually every aspect of prehospital emergency medical services. The Legislature's desire to achieve coordination and integration is evident throughout. The EMS Act accomplishes this integration through what is essentially a two-tiered system of regulation." (*County of San Bernardino, supra,* 15 Cal.4th at p. 915.) The two tiers consist of a state Authority, which "performs a number of different functions relating to the coordination of EMS throughout the state" (*ibid.*), and an EMS agency established by a county, or a joint powers agency of counties or counties and cities, which plans, implements, and evaluates emergency medical service systems on a countywide or multicounty basis, and which maintains " '[t]he medical [control] and management of an emergency medical services system.' " (*Id.* at p. 916.) As we have construed it, this statute and relevant regulations "broadly mandate that the local EMS agency formulate medically related policies and procedures to govern EMS providers." (*Id.* at p. 927.)

The Legislature has also accorded a significant role in the governance of emergency medical services to cities and fire districts that have "contracted for or provided, as of June 1, 1980, prehospital emergency medical services." (§ 1797.201.) These cities and fire districts have the option of requesting an agreement with counties "regarding the provision of prehospital emergency medical services for that city or fire district." (*Ibid.*) "Until such time that an

agreement is reached, prehospital emergency medical services shall be continued at not less than the existing level, and the administration of prehospital EMS by cities and fire districts presently providing such services shall be retained by those cities and fire districts, except the level of prehospital EMS may be reduced where the city council, or the governing body of a fire district, pursuant to a public hearing, determines that the reduction is necessary." (*Ibid.*)

▪ In *County of San Bernardino, supra,* 15 Cal.4th 909, we had occasion to construe the meaning of section 1797.201. As we explained, although a city or fire district is permitted, under section 1797.201, to maintain administration of its own EMS indefinitely (15 Cal.4th at pp. 923-925), it does so subject to the significant constraint placed on its administrative discretion by the EMS agency's medical control authority (*id.* at pp. 925-929). We also construed section 1797.201 as restricting the ability of section 1797.201 cities and fire districts to unilaterally expand the scope of their services. (15 Cal.4th at pp. 929-934.) We further explained that although the Fire Protection District Law of 1987 authorizes fire districts to engage in emergency medical services, it does so subject to the limitations of the EMS Act. (§ 13862, subds. (b) & (c).) Thus, we concluded that "section 1797.201 indubitably limits fire districts' ability to provide EMS, and indeed deprives such districts of the ability to provide these services altogether without the consent of the local EMS agency if the district did not provide or contract for such services as of June 1, 1980, notwithstanding the Fire District Law's general authorization of fire districts as providers of emergency medical services." (15 Cal.4th at p. 933.)

▪ The portion of the *County of San Bernardino* opinion that concerns whether a city or fire district may expand the scope of the emergency medical services it administers is most directly relevant to the issue posed in this case, and for this reason will be quoted at length. As we stated: "The starting point of our analysis of the expansion issue is the statutory language of section 1797.201 itself. As discussed, the first sentence makes clear that cities and fire districts may only continue to provide emergency medical services if they have done so as of June 1, 1980. The second sentence then states: 'Until such time that an agreement is reached, prehospital emergency medical services shall be continued at not less than the existing level, and the administration of prehospital EMS by cities and fire districts presently providing such services shall be retained by those cities and fire districts, . . .' (*Ibid.*) The critical language of the sentence is 'administration of prehospital EMS by cities and fire districts presently providing such services shall be *retained* . . . .' (*Ibid.,* italics added.) The choice of the

word 'retained' implies that cities and fire districts are able to exercise the administrative control which they had already exercised as of June 1, 1980, for they can 'retain' only those administrative powers that they already possessed. Thus, if [a] [c]ity [or fire district] controlled a certain domain of prehospital emergency medical services, such as paramedical services, then under section 1797.201 it would retain administrative control of those services. But [if the city or fire district] did not exercise administrative control over ambulance services as of 1980, . . . then [it] cannot be said to 'retain' administration of that function.

"Such a construction is also consistent with the overall purpose of section 1797.201. [A city or fire district may] contend[] that section 1797.201 was a broad recognition or authorization of autonomy in the administration of emergency medical services for cities and fire districts. [A] [c]ounty [may] contend[] that the purpose of the provision is merely to allow such entities to protect the investments they had already made in various assets—emergency medical equipment, infrastructure, personnel, etc., at the time of the passage of the EMS Act. Neither position is entirely correct, but the [latter] is more nearly so. If section 1797.201 was [a] grant or recognition of local autonomy . . . , then why would such autonomy be made conditional upon a city or fire district 'contracting for or providing' EMS services as of June 1, 1980? And why make the critical date six months before the effective date of the act, if not to fix the status quo and preclude cities and fire districts from making or expanding their claim for local autonomy before the act went into effect? And why use the retrospective term 'retained' rather than 'exercised' or some other term conveying the outright grant of authority? In short, section 1797.201 appears to be a preservation of the status quo rather than a broad authorization of . . . autonomy.

". . . . . . . . . . . . . . . . . . . . . . . . .

"A restrictive view of cities' and fire districts' ability to expand is also suggested by the phrase '[u]ntil such time as an agreement is reached' to characterize the period in which cities and fire districts are to retain their autonomy. As explained above, while section 1797.201 does not require cities and fire districts to enter an agreement by a particular time, the use of this phrase conveys the legislative goal that such agreements eventually be reached, and that these agencies be integrated into the local EMS system. To construe section 1797.201 to permit cities and fire districts not only to retain but also to expand their autonomy, moving even farther away from the goal of integration, appears to be contrary to the legislative intent implicit in section 1797.201.

"The above interpretation is not only consistent with the language and purpose of section 1797.201 but with the object of the EMS Act overall. As reviewed above, the Legislature's desire to achieve coordination and integration is evident throughout the act. One of the key provisions of the act is section 1797.204, which requires the local EMS agency to 'plan, implement, and evaluate an emergency medical services system, in accordance with the provisions of this part, consisting of an organized pattern of readiness and response services based on public and private agreements and operational procedures.' Section 1797.254 requires EMS agencies to 'annually submit an emergency medical services plan for the EMS areas to the authority.' Thus, one of the primary legislative objectives of the EMS Act is to enable local EMS agencies, in conjunction with the Authority, to plan, coordinate and implement a comprehensive EMS system.

"In order to successfully plan and implement an EMS system, the local agency must be able to either control or predict, to some degree, the way in which emergency medical services will be provided within its jurisdiction. If the cities' and fire districts' authority within the EMS system is fixed at some historical point, then the local EMS agencies will be able to take this authority into account when they plan their EMS systems. But if, as the City asserts, a city or fire district that provided some emergency services prior to 1980 can expand at will its domain of control into any area of emergency medical services, and can at any moment withdraw from an EMS system to which it has hitherto given its de facto cooperation, then this would make it virtually impossible for local EMS agencies to carry out those planning functions. Therefore, although the statutory language is not free from ambiguity, reading the phrase 'administration . . . shall be retained' in a fairly narrow fashion is not only consistent with the language and manifest purpose of section 1797.201 but with the basic legislative aims of the EMS Act." (*County of San Bernardino, supra,* 15 Cal.4th at pp. 929-931.)

At the core of our holding on the expansion issue in *County of San Bernardino* is a distinction between *types* and *levels* of emergency medical services. A section 1797.201 city or fire district may increase the level of emergency medical services above what it was in 1980 (see *County of San Bernardino, supra,* 15 Cal.4th at p. 930), and may decrease that level if the statutorily prescribed procedures are followed. But it may not expand into new types of emergency medical services previously administered by the local EMS agency. (*Id.* at p. 934.) Thus, although the City of San Bernardino could increase the levels of the services it had historically provided as of 1980, and had continued to provide since then, it could not expand the scope of its operation into ambulance services that had been previously administered by the county and the local EMS agency.

■ With the above principles in mind, we address the question whether a city or fire district eligible to provide emergency medical services under section 1797.201 that ceases to provide such services sometime after the passage of the EMS Act, and permits those services to be provided or administered by the local EMS agency, may then unilaterally resume administration of emergency medical services at some point in the future. We conclude that this question must be answered in the negative, for many of the same reasons discussed in *County of San Bernardino* as to why a city or fire district cannot expand services. As explained above, section 1797.201 is not "a broad recognition or authorization of autonomy in the administration of emergency medical services for cities and fire districts" (*County of San Bernardino, supra*, 15 Cal.4th at p. 929), but is essentially a grandfathering of existing emergency medical service operations until such time as these services are integrated into the larger EMS system. The apparent purpose of this grandfathering provision was to "allow such entities to protect the investments they had already made in various assets—emergency medical equipment, infrastructure, personnel, etc." (*id.* at pp. 929-930), as well as to ensure against the disruption of adequate emergency medical services (see *id.* at p. 930). There is little if any reason to extend this kind of grandfathering protection to those cities and fire districts that have voluntarily abandoned these operations and allowed them to be assumed by the local EMS authority.

Moreover, the language of section 1797.201 itself provides only for cities and fire districts to *continue* to do what they had been doing as of June 1, 1980, and not to resume what they ceased to do. Indeed, the statute makes clear that cities and fire districts have not only the right but the *obligation* to continue to provide emergency medical services until an agreement is reached with a county. The statute states that "[u]ntil such time that an agreement is reached" between a city or fire district and a county, "prehospital emergency medical services *shall be continued* at not less than the existing level, and the administration of prehospital EMS by cities and fire districts presently providing such services *shall be retained* by those cities and fire districts." (*Ibid.*, italics added.) Although the statute provides the means by which a city or fire district may reduce the level of EMS, nothing in the statute permits a city or fire district to abandon these services altogether, short of an agreement with a county. One of section 1797.201's evident purposes is to ensure a continuity of emergency medical services for residents of section 1797.201 cities and fire districts until agreements have been reached integrating these jurisdictions into the local EMS agency. Thus, a city's or fire district's rights and obligations under section 1797.201 are inextricably conjoined, and the statute does not appear to contemplate

that these jurisdictions would forego the latter without surrendering the former.

Nor would the overall purposes of the EMS Act be served by the District's construction, because such construction would be contrary to a local EMS agency's authority to create exclusive operating areas (EOA's) for EMS providers authorized by section 1797.224. As we stated in *County of San Bernardino*: "[T]he Legislature recognized [that] creating an EOA is an important administrative tool for designing an EMS system, for it allows these agencies to plan and implement EMS systems that will meet the needs of their constituencies and at the same time ensure that the EMS providers with which they contract have a territory sufficiently populated to make the provision of these services economically viable. [Citation.] . . . [¶] The ability to create EOA's recognized in section 1797.224 would be rendered largely futile, however, if cities or fire districts that had no history of operating ambulance services were able at any time to expand into these services, thereby partially nullifying an existing EOA." (*County of San Bernardino, supra,* 15 Cal.4th at pp. 931-932.) The very same considerations are present when the question is resumption of abandoned services rather than expansion into new services. Stated more concretely, an EOA permits local EMS agencies to offer private emergency service providers protection from competition in profitable, populous areas in exchange for the obligation to serve unprofitable, more sparsely populated areas. The resumption of service by the District and the District's withdrawal from the EOA would, in the Court of Appeal's words, "destroy the careful economic balance struck in the Transportation Plan."

It is true that the ability to create EOA's in section 1797.224 is made expressly subject to 1797.201, and therefore would not permit a county or EMS agency to unilaterally displace a city or fire district continuing to operate emergency medical services. But nothing in section 1797.224 prevents a local EMS agency from assigning an EOA within the borders of a city or fire district to a private provider, if the city or fire district ceases to offer a certain type of emergency medical service. And nothing in either section 1797.201 or section 1797.224 suggests that once a city or fire district has abandoned emergency medical services and allowed another entity, pursuant to an EOA, to provide such services, it has the right to nullify the EOA by resuming control of these operations.

Moreover, as we explained in *County of San Bernardino, supra,* 15 Cal.4th at page 930, "while section 1797.201 does not require cities and fire districts to enter an agreement by a particular time, the use of [the] phrase ['[u]ntil

such time as an agreement is reached'] conveys the legislative goal that such agreements eventually be reached, and that these agencies be integrated into the local EMS system. To construe section 1797.201 to permit cities and fire districts not only to retain but also to expand their autonomy, moving even farther away from the goal of integration, appears to be contrary to the legislative intent implicit in section 1797.201." So too, to permit cities and fire districts that have already voluntarily relinquished operation of emergency medical services to the local EMS agency and therefore become at least partially integrated into a countywide or regional system to then withdraw from such a scheme seems contrary to the EMS Act's goal of integration.

Nor does it make a difference, from the standpoint of our analysis, whether a city or fire district relinquishes all of its emergency medical service operations, or merely a distinct type of emergency services, such as ambulance services. In either case, the same considerations apply. Just as the scope of a city's or fire district's control over emergency medical services is fixed by what it administered as of June 1, 1980, and may not be expanded unilaterally, so the scope of its control may be limited when it discontinues a particular type of emergency service and permits the local EMS agency to assume control over such service. In either case, the purpose underlying section 1797.201 and the EMS Act overall would be disserved if the city or fire district was able to unilaterally take control over a type of service that the local EMS agency or one of its franchisees had been providing pursuant to the EMS Act. And although the question whether a section 1797.201 city or fire district is increasing the "level" of its services or expanding into a new "type" of service may sometimes be a close one, it is not so in the present case, where all parties treated ambulance services as a discrete and severable type of EMS.

The District asserts that section 1797.201 is clear on its face in only requiring a city or fire district to have administered emergency medical services as of June 1, 1980, not that it *continually* provide such services thereafter. But as discussed, section 1797.201 provides no such automatic guaranty to a city and fire district. It simply declares that a city and fire district that had been operating emergency medical services as of that date may continue to do so, and says nothing about whether a city or fire district that had voluntarily discontinued such services after that date has the right to resume them. We conclude, from the language and purpose of section 1797.201 and the EMS Act overall, that section 1797.201 does not provide for a right of resumption.

Nor are we persuaded by the District's argument that, unlike section 1797.224, section 1797.201 does not explicitly state that the requirement that

a city or fire district continue EMS until reaching an agreement with the county means "continue without interruption." Section 1797.224 makes clear that a city or fire district that has provided emergency medical services "without interruption since January 1, 1981," can be assigned exclusive operating areas without going through a competitive bidding process. This statute, written three years after section 1797.201 went into effect, has a structure and purpose quite different from section 1797.201, and there is no reason to read anything into the Legislature's failure to use identical language in the two provisions. Other language in 1797.201, discussed above, strongly implies that the phrase "shall be continued" means "continued without interruption," and, given that, it is no surprise that the drafters of section 1797.201 did not feel obliged to insert the latter phrase into the statute.

Finally, the District argues that the quality of Valley's services has been poor, and that the District is better able to provide those services for itself. That may be the case, but it is also the case that the EMS Act is designed to encourage coordination and planning among various local jurisdictions in order to achieve the most effective EMS operations on a countywide or regionwide basis. The solution that the EMS Act in general, and section 1797.201 in particular, offers to the District is to enter into an agreement with the County that would be mutually satisfactory. Indeed, the Legislature appears to have assumed, in drafting section 1797.201, that cities and fire districts have interests in maintaining quality emergency medical services that are not fundamentally adverse to counties' interest in the same, and that therefore agreements between these public entities is both possible and desirable. If that assumption has proven historically to be incorrect, then the District and other similarly situated public entities must resort to the Legislature, not to the courts, to amend the EMS Act.[4]

In sum, section 1797.201 gives cities and fire districts that administered prehospital EMS on June 1, 1980, the right to continue to do so. When a city or fire district ceases to be involved in the administration of some distinct part of EMS, and allows the local EMS agency to assume that authority, then it no longer has the prerogative to unilaterally resume control of that part of the EMS operation. When a city or fire district, as in this case, abandons

---

[4]The District requests that we take notice of various declarations submitted in two similar cases presently under litigation, as court records pursuant to Evidence Code sections 452, subdivision (d), and 459, subdivision (a). The declarations purport to show, inter alia, that other fire districts have had similar service problems with private ambulance providers. Because these declarations lack relevance to the present case, we deny the request.

ambulance services in 1984, and the county assumes exclusive control of such services, it may not, in 1994, reassert its control.[5]

## IV. DISPOSITION

By reason of construction of section 1797.201 discussed above, we affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

---

[5]Shortly before oral argument, in its answer to amicus curiae California Ambulance Association's brief, the District asserted for the first time that it did indeed continue to "administer" ambulance services, if not provide them directly, and therefore had not actually abandoned operation of those services. The District also made this assertion at oral argument. What the District appears to regard as "administration," however, is essentially the role it continued to play, ancillary to its own EMS functions, in dispatching ambulance services. If, in fact, the District has continually provided such dispatch functions, then it may, of course, continue to do so. These functions are, however, subject to the medical control of the local EMS agency. (See *County of San Bernardino, supra*, 15 Cal.4th at pp. 925-926.) Nothing in the record indicates that the District possessed administrative control of Valley's ambulance operations.