[No. C060407. Third Dist. Aug. 27, 2010.]

COUNTY OF BUTTE, Cross-complainant and Appellant, v.
EMERGENCY MEDICAL SERVICES AUTHORITY, Cross-defendant and
Respondent;
FIRST RESPONDER EMERGENCY MEDICAL SERVICES, INC., et al.,
Interveners and Appellants;
PRIORITY ONE MEDICAL TRANSPORT, INC., Intervener and
Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication
with the exception of part VI.

1176

1180

COUNSEL

Bruce Alpert, County Counsel, Elizabeth McGie, Assistant County Counsel; Greenberg Traurig, Kevin T. Collins and Ray A. Sardo for Cross-complainant and Appellant.

Peters, Rush, Habib & McKenna, Mark A. Habib; Page, Wolfberg & Wirth and Douglas M. Wolfberg for Interveners and Appellants.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, Julie Weng-Gutierrez and Brenda A. Ray, Deputy Attorneys General, for Cross-defendant and Respondent.

Law Office of Kenneth D. Baker and Kenneth D. Baker for Intervener and Respondent.

OPINION

**SCOTLAND, P. J.**—The Emergency Medical Services System and the Prehospital Emergency Medical Care Personnel Act (EMS Act; Health & Saf. Code, § 1797 et seq.) was enacted in 1980 to "provide the state with a statewide system for emergency medical services" and to "ensure the provision of effective and efficient emergency medical care" to the people of California. (Stats. 1980, ch. 1260, § 7, pp. 4261–4277; Health & Saf. Code, §§ 1797.1, 1797.6, subd. (a); further section references are to the Health and Safety Code unless otherwise specified.)

Through the EMS Act, the Legislature created essentially a two-tiered regulatory system "governing virtually every aspect of prehospital emergency medical services." (*County of San Bernardino v. City of San Bernardino* (1997) 15 Cal.4th 909, 915 [64 Cal.Rptr.2d 814, 938 P.2d 876] (hereafter *County of San Bernardino*).) The first tier is occupied by the Emergency Medical Services Authority (the Authority), a division of the California Health and Human Services Agency, "which is responsible for the coordination and integration of all state activities concerning emergency medical services." (§ 1797.1; see § 1797.100.) The second tier of governance is "a local EMS agency" (§ 1797.200), which is responsible for, among other things, "(1) planning, implementing, and evaluating an emergency medical services system 'consisting of an organized pattern of readiness and response services based on public and private agreements and operational procedures' (§ 1797.204); (2) developing a formal plan for the system in accordance with the Authority's guidelines and submitting the plan to the Authority on an annual basis (§§ 1797.250, 1797.254); [and] (3) 'consistent with such plan,

coordinat[ing] and otherwise facilitat[ing] arrangements necessary to develop the emergency medical services system' (§ 1797.252)." (*County of San Bernardino, supra*, 15 Cal.4th at p. 916.)

 In this case, we are called upon to determine whether a county may contractually designate a local EMS (emergency medical services) agency to administer some of the requirements of the EMS Act, while reserving for another local EMS agency all of the remaining statutory powers and duties not covered by the agreement.

The short answer is "no." As we will explain, the EMS Act authorizes a county to designate "a local EMS agency" (§ 1797.200), not two such agencies sharing the statutory powers and duties of chapter 4 of the EMS Act.

We are also asked to decide whether the Authority has the statutory power to disapprove a local EMS agency's designation of an exclusive operating area through the grandfathering provision of section 1797.224 of the EMS Act, which states in part: "A local EMS agency may create one or more exclusive operating areas in the development of a local plan, if a competitive process is utilized to select the provider or providers of the services pursuant to the plan. No competitive process is required if the local EMS agency develops or implements a local plan that continues the use of existing providers operating within a local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981. A local EMS agency which elects to create one or more exclusive operating areas in the development of a local plan shall develop and submit for approval to the [A]uthority, as part of the local EMS plan, its competitive process for selecting providers and determining the scope of their operations."

The short answer is "yes." As we will explain, an exclusive operating area (EOA) is "an EMS area or subarea defined by the emergency medical services plan for which a local EMS agency, upon the recommendation of a county, restricts operations to one or more emergency ambulance services or providers of limited advanced life support or advanced life support." (§ 1797.85.) The creation of an EOA is an " 'important administrative tool for designing an EMS system' " because "an EOA permits local EMS agencies to offer private emergency service providers protection from competition in profitable, populous areas in exchange for the obligation to serve unprofitable, more sparsely populated areas." (*Valley Medical Transport, Inc. v. Apple Valley Fire Protection Dist.* (1998) 17 Cal.4th 747, 759 [72 Cal.Rptr.2d 647, 952 P.2d 664] (hereafter *Apple Valley*), quoting *County of San Bernardino, supra*, 15 Cal.4th at pp. 931–932.) Because the local EMS agency is required by the EMS Act to "annually submit an emergency medical services plan for

the EMS area to the [A]uthority" (§ 1797.254), which plan must include the subject of transportation of emergency medical patients (§§ 1797.76, 1797.103, subd. (c), 1797.70, 1797.72), and because the Authority possesses the statutory authority to reject a local EMS plan if "the plan is not concordant and consistent with applicable guidelines or regulations, or both the guidelines and regulations, established by the [A]uthority" (§ 1797.105, subd. (b)), it follows that the Authority has the statutory power to reject a local EMS agency's creation of an EOA as part of the transportation portion of the local EMS plan, regardless of whether that EOA was created through a competitive process or grandfathering.

We also reject the claim that the judgment must be reversed because, in interpreting the "manner and scope" language of section 1797.224, the Authority relied on an invalid underground regulation not promulgated in compliance with the Administrative Procedure Act (Gov. Code, § 11340 et seq.).

## BACKGROUND

In August 1991, Butte County entered into an agreement with Northern California Emergency Medical Services, Inc. (Nor-Cal EMS), designating Nor-Cal EMS to "administer *certain* local emergency medical services as specified" in the agreement and to "administer *certain* 'local EMS agency' requirements called for under [the EMS Act]." (Italics added.) Paragraph 3 of the agreement provides that Butte County "delegates *only those functions enumerated in this agreement* to [Nor-Cal EMS] and which may be delegated pursuant to [s]ections 1797.94 and 1797.200; and *for those purposes only*, [Nor-Cal EMS] shall act as the local EMS agency." (Italics added.)

The vast majority of local EMS agency functions are enumerated in the agreement. For instance, paragraphs 5 and 6 of the agreement state that Nor-Cal EMS "shall plan, implement and evaluate an emergency medical services system in accordance with the provisions of the [EMS] Act, consisting of an organized pattern of readiness and response services based upon public and private agreements and operational procedures ([see §] 1797.204)." Those paragraphs also require Nor-Cal EMS to have a "licensed physician and surgeon as Medical Director to provide medical control and to assure medical accountability throughout the planning, implementation and evaluation of the EMS system" (see § 1797.202). And the agreement makes Nor-Cal EMS responsible for, among other things, "submit[ting] an [annual] emergency medical services plan for [Butte County] to the [Authority]" (see §§ 1797.250, 1797.254) and, "consistent with such plan, coordinat[ing] and otherwise facilitat[ing] arrangements necessary to develop the emergency medical services system" (see § 1797.252).

Conspicuously absent from the agreement is enumeration of the authority to "create one or more exclusive operating areas in the development of a local plan" pursuant to section 1797.224. The apparent intent of the contracting parties was to create a bifurcated system in Butte County consisting of two local EMS agencies. Nor-Cal EMS would be responsible for all local EMS agency functions delineated in the agreement, while the Butte County Public Health Department would retain the statutory authority to create EOA's pursuant to section 1797.224. Such an intent was expressed by Chester L. Ward, M.D., the Butte County Health Officer: "Butte County has . . . designated [Nor-Cal EMS] as the [local EMS agency] for limited purposes. However, [Nor-Cal EMS] is not the local EMS [a]gency relative to exclusive operating areas of and within Butte County. For that purpose, the Butte County Public Health Department is the [local EMS agency]."[1]

In June 1992, on behalf of the Butte County Public Health Department, Dr. Ward issued an order (the EOA order) directing that the county's local EMS plan be amended to establish EOA's pursuant to section 1797.224. Among other things, Dr. Ward found that "[b]efore January 1, 1981 and continuing through the present, the County of Butte has been divided into five (5) operating areas for the provision of emergency medical services to the citizens of Butte County"; "[t]hese [EOA's] have not changed significantly in scope or geographic area since prior to January 1, 1981"; "[w]ithin each area, one or more operators have been providing emergency medical services, on an exclusive basis, prior to January 1, 1981, and continuously to the present, as those relevant terms have been defined by the [Authority]"; "[e]ach of the service operators providing service within each of the designated [EOA's] have [sic] provided emergency medical services to the citizens of Butte County within each EOA in the same manner and scope since at least January 1, 1981"; and, "pursuant to [section] 1797.224, no competitive process for selection of exclusive operators is required in that this plan will continue the use of existing providers operating within the [c]ounty in the manner and scope in which the services have been provided without interruption since January 1, 1981." In accordance with these findings, Dr. Ward ordered that "the current and present operators providing service within [their respective EOA's] be deemed the exclusive operators within each area."

---

[1] It appears that Nor-Cal EMS concurred in this understanding of the contract, as reflected in a letter Nor-Cal EMS sent to the Authority "clarify[ing] the intentions of Butte County and [Nor-Cal EMS] regarding the establishment of [EOA's]" and attaching a Butte County Board of Supervisors's draft resolution explaining that, "in the development of a local plan, the Butte County Health Officer act[ed] . . . [to] formally establish[] [EOA's]" pursuant to section 1797.224.

Three of the five EOA's established by the Butte County Public Health Department are at issue in this appeal—the area surrounding Chico (Zone 1), the area surrounding Paradise (Zone 2), and the area surrounding Oroville (Zone 3).

Zone 1 had been serviced by Enloe Medical Center (Enloe) and First Responder Emergency Medical Services, Inc. (First Responder), since 1978.[2] This area of operation remained "essentially unchanged," except for "minor changes in 1987 due to overlapping of service to certain areas of the map where thick lines had been drawn which left some room for dispatch interpretation." Zone 2 had been serviced by First Responder since 1997 when First Responder purchased Paradise Ambulance Service, which had serviced the area from 1980 to 1997. This area of operation expanded in 1987 to include Butte College, which until then had been serviced by the Chico area providers. Zone 3 had been serviced by First Responder since 2002, when First Responder purchased the service from Oroville Hospital Ambulance which had serviced the area from 1982 to 2002, having acquired it from Oroville Ambulance, which had serviced the area from 1972 to 1982.

In July 1992, Dr. Ward submitted to the Authority an amendment to Butte County's EMS plan establishing the EOA's, along with "copies of correspondence [Dr. Ward] had received from each current provider, attesting to their service times and levels." He "requested that [the Authority] approve [the] plan and confirm [the Butte County Public Health Department's] ability to grandfather the current providers into the [EOA's]."

Acknowledging that "authority for the administration of the emergency ambulance services program has been retained by the Butte County Health Department," the Authority directed Dr. Ward to provide more information about "the continuity of providers within the zones for which grandfathering is proposed" and "a complete description of [Butte County's] transportation system[,] justification for the use of zones, both clinically and economically[, and] identification of the level of exclusivity [the Butte County Public Health Department] would be granting." The record does not reveal whether the Butte County Public Health Department responded to the Authority's request for more information.

In April 1993, the Butte County Counsel sent a letter to the attorney for a prospective ambulance operator explaining the county's view that EOA's were established by Dr. Ward's EOA order and that the Authority's approval was not required. As Butte County interpreted section 1797.224, a local EMS

---

[2] First Responder went by the name Chico Ambulance until 1980, and then by the name Chico Paramedic Rescue until 1991, when it was incorporated under the name First Responder.

agency may create EOA's either through a competitive bid process or through grandfathering; and only when a competitive bid process is used is the local EMS agency required to obtain the approval of the Authority. Thus, because Dr. Ward established EOA's through grandfathering, the county believed that approval of the Authority was not required. However, this letter also expressed the position that Dr. Ward's EOA order was meant to be an "interim" measure, and that there would eventually be "a formal addition to the local EMS plan calling for competitive bidding."

In December 1993, Nor-Cal EMS wrote to the Authority in order to "clarify the intentions of Butte County and [Nor-Cal EMS] regarding the establishment of [EOA's] by means of the grandfathering provisions of [s]ection 1797.224." Nor-Cal EMS explained that "establishment of new services in Butte County have [sic] been temporarily put on hold. This will allow time for the development of a competitive bid process, as referenced in [section] 1797.224."

In January 1994, the board of supervisors passed resolution No. 94-12, which (1) formally adopted the findings and conclusions of Dr. Ward set forth in the EOA order, (2) purported to formally amend Butte County's local EMS plan by "creating the [EOA's] set forth in [the EOA order] and establishing the current operators in those areas as exclusive operators," subject to the qualification that "[t]he installation of the operators within the [EOA's] is intended as an interim measure," and (3) established a schedule providing for a competitive process for each of Butte County's five zones of operation. However, Butte County never actually implemented the competitive bid process called for by this resolution.

In March 1996, the interim health officer of the Butte County Public Health Department, after consulting with the emergency medical care committee and Nor-Cal EMS, issued an order (second EOA order) finding that "the maintenance of [EOA's] and the continued utilization of the current providers as exclusive providers within those areas is proper and appropriate for the same reasons as set forth in Dr. Ward's [EOA order]," and directing "that the currently established operating areas remain in place and that the current exclusive operators now installed as exclusive providers remain so installed as exclusive providers and that no competitive bid process is either required nor in the best interest of the citizens of [Butte County] at this time."

The following month, the board of supervisors passed resolution No. 96-40, which rescinded the schedule providing for a competitive bid process that was set forth in resolution No. 94-12. By this resolution, the board expressed Butte County's position that (1) section 1797.224 gives the Butte County Public Health Department, as the local EMS agency with respect to the establishment

of EOA's, "the authority to create one or more [EOA's] in the development of a local plan"; (2) "no competitive bid process is required for the selection of exclusive operators within [EOA's] if the local EMS agency develops or implements a local plan that continues the use of existing providers within the county in the manner and scope in which services have been provided without interruption since January 1, 1981"; and (3) "the EMS Act unequivocally establishes that the local EMS agency, not the Board of Supervisors, may establish an [EOA] as such a decision is a professional, not a political determination . . . ."

In March 2000, Nor-Cal EMS submitted Butte County's EMS plan to the Authority, including the EOA's ordered by the Butte County Public Health Department, and then submitted additional revisions in 2001.

In July 2001, the Authority approved the plan, except for the section grandfathering the existing emergency service providers into their respective EOA's. In the Authority's view, the December 1993 letter from Nor-Cal EMS to the Authority and resolution No. 94-12, both expressing the intention to establish a competitive process for choosing exclusive operators in Butte County, "changed the scope and manner of operation, [and] therefore, 'grandfathering' the Chico, Oroville, and Paradise zones is not possible." In response, an attorney representing Butte County sent a letter to the Authority explaining that, while resolution No. 94-12 called for a timed sequence of competitive bidding, this competitive process was vacated by resolution No. 96-40; therefore, "the 'scope and the manner' of [Butte County's] operation" was not altered by resolution No. 94-12. However, the Authority held firm to its position regarding grandfathering, explaining that the "scope and manner [of operation] had changed because [Butte County's] EMS transportation plan [had] changed."

In 2004, Byron Parsons, CEO of First Responder, convinced the Butte County Counsel to press the Authority a final time for its position regarding grandfathering. In April 2004, the county counsel wrote to Parsons stating the county "accepts and intends to comply with the [Authority's] position regarding issues of exclusivity and grandfathering."

In March 2005, Parsons met with David Reade, chief of staff to Assembly-member Doug LaMalfa, concerning the grandfathering issue in Butte County. The Authority then sent Reade a letter explaining that "to establish exclusive zones and install the providers that were serving the county in 1992 would require a clear determination of eligibility for exclusivity. To date, however, the lack of pertinent and sufficient supporting evidence has hindered such a declaration. [Section 1797.224] states that services must have been provided, without interruption, since January 1, 1981. Since that date, three services in

the Chico, Oroville, and Paradise areas have changed ownership, and, in the Paradise area, three different owners have operated the ambulance service. Sufficient documentation has never been submitted to the [Authority] to verify whether these purchases were reorganizations of the existing entity. [¶] In addition, in researching this issue further, it appears that a significant boundary change was made to the [Paradise area]. In 1987, the Butte College campus was incorporated into the zone, adding a daytime population of over 10,000 students. Absent substantive supporting documentation over 13 years, these changes appear to have further modified the 'manner and scope' of operations, as described in [section 1797.224], and would preclude granting exclusivity to these providers in those areas." This letter was copied to Parsons.

In response, Parsons brought to the Authority's attention a 1992 letter it had sent to San Luis Obispo County's local EMS agency in which the Authority explained a "[c]hange in ownership, in and of itself, would not prevent a county from grandfathering an existing operation into an [EOA]." Parsons also brought to the Authority's attention a 1992 letter it had sent to Sonoma County's local EMS agency in which the Authority explained that "policy decisions regarding the exclusivity or non-exclusivity of emergency ambulance operations and in the creation of [EOA's] are decisions made by the local EMS agency," and that "[c]hanges to the status of exclusivity are within the legal authority of the local EMS agency to plan, implement, and evaluate an EMS system." Parsons also disputed the Authority's conclusion that the transfer of the Butte College campus from the Chico zone to the Paradise zone constituted a "significant change in the scope or manner" of operations.

In September 2005, the Authority sent a letter to Nor-Cal EMS explaining that First Responder had asked that the Butte County EMS plan be amended to create EOA's. The Authority said if Nor-Cal EMS wished to establish EOA's through grandfathering, the current providers would have to "supply to the local agency appropriate documentation regarding their eligibility for grandfathering," and Nor-Cal EMS would have to "amend the local EMS plan accordingly." In a followup letter, the Authority clarified it had not changed its position regarding EOA's in Butte County: "Previous EOA plan submissions, except [the Gridley area], were incomplete despite our requests for additional information and were not approved. If you wish to create EOAs you must submit an amended EMS plan for the Authority to review, as required by [section 1797.224]. Until such time as an EMS plan is approved, Butte County, except [the Gridley area], remains a non-exclusive area." In this letter, the Authority asserted for the first time that Nor-Cal EMS, and not the Butte County Public Health Department, was the local EMS agency with

the statutory authority to establish EOA's—"Once a local EMS agency is designated pursuant to section 1797.200, all responsibility and authority is vested in that entity."

Thereafter, in January 2006, Nor-Cal EMS approved Priority One Medical Transport, Inc. (Priority One), to provide emergency medical services in the Oroville area subject to securing a base hospital and determining the dispatch logistics of 9-1-1 calls. However, because Priority One was unable to secure a base hospital, it was unable to begin operations within Butte County.

First Responder, Enloe, and Oroville Hospital (hereafter collectively, First Responder) ultimately brought an action against Nor-Cal EMS and Butte County seeking declaratory and injunctive relief. First Responder sought the following judicial declarations: (1) The agreement between Nor-Cal EMS and Butte County does not grant Nor-Cal EMS any authority with respect to section 1797.224; (2) Butte County retains the rights of a local EMS agency with regard to the creation and designation of EOA's in Butte County and all other matters arising under or relating to section 1797.224; (3) Nor-Cal EMS has no power or authority with regard to any matters arising under or relating to section 1797.224 with respect to Butte County; and (4) Nor-Cal EMS has no authority to attempt to integrate additional emergency medical service providers into the EOA's set up in Butte County. The complaint also sought a permanent injunction prohibiting Nor-Cal EMS from taking any action to integrate any additional emergency medical service providers into Butte County or taking any other action pursuant to section 1797.224.

Butte County answered the complaint and filed a cross-complaint against the Authority, seeking declaratory relief and a writ of mandate. It sought "a declaration setting forth the rights and duties of [Butte County] and the [Authority] with regard to whether (1) [Butte County] has the authority to exercise powers granted under section 1797.224 of the EMS Act, and (2) whether the [c]urrent [p]roviders are eligible for EOAs via grandfathering." It also sought a writ of mandate "compelling the [Authority] to refrain from enforcing against [Butte County] the [Authority's] interpretation that, under [section 1797.224], [Nor-Cal EMS] exercises exclusive [local EMS agency] powers and the [c]urrent [p]roviders are not properly grandfathered [into their respective] EOAs." Butte County filed a separate petition for writ of mandate.[3]

The trial court denied Butte County's petition for writ of mandate. As to whether Nor-Cal EMS possessed the authority to designate EOA's pursuant

---

[3] First Responder and Nor-Cal EMS filed notices of nonopposition and joinder in Butte County's petition for writ of mandate, and Priority One successfully moved to intervene in the litigation. First Responder also was allowed to intervene in Butte County's cross-complaint.

to section 1797.224, the court ruled: "[T]he powers of a local EMS agency are those assigned by statute, including the power to designate EOAs, and that such statutorily based powers may not be varied or limited by contract. Therefore, the court finds, based on statute, that the local EMS [agency] [Nor-Cal EMS] did have authority over designation of EOAs, regardless of the language of the contracts, or the intent of the contracting parties." The court further found it could not order the Authority to refrain from enforcing its determination that the current emergency medical services providers were not properly grandfathered. This was so because "the duty of the Authority to determine whether the [Nor-Cal EMS] plan for Butte County is acceptable is a discretionary duty" and, "[a]lthough it is possible that the Authority did not reach the correct result, this would not constitute abuse of discretion, and would not justify intervention by the superior court."

The Authority then moved for summary judgment, which the trial court granted because it found that the issues raised in Butte County's declaratory relief cause of action were "essentially indistinguishable from the issue[s] already decided by the court in ruling on the petition for writ of mandate."

After First Responder dismissed the complaint against Butte County and Nor-Cal EMS, judgment was entered in favor of the Authority on Butte County's cross-complaint. This appeal followed.

## DISCUSSION

### I

Prior to the enactment of the EMS Act, "the law governing the delivery of prehospital emergency medical services was haphazard." (*County of San Bernardino, supra*, 15 Cal.4th at p. 914.) Through the EMS Act, the Legislature created essentially a two-tiered regulatory system "governing virtually every aspect of prehospital emergency medical services." (15 Cal.4th at p. 915.) The overarching purpose of this statutory scheme was to "provide the state with a statewide system for emergency medical services" and to "ensure the provision of effective and efficient emergency medical care" to the people of California. (§§ 1797.1, 1797.6, subd. (a).)

The first tier of governance under the EMS Act is occupied by the Authority, a division of the California Health and Human Services Agency "which is responsible for the coordination and integration of all state activities concerning emergency medical services." (§ 1797.1; see also § 1797.100.) The Authority is required to "develop planning and implementation guidelines for emergency medical services systems" which address, among other things, manpower and training, communications, transportation,

assessment of hospitals and critical care centers, and system organization and management. (§ 1797.103.) It is also required to "receive plans for the implementation of emergency medical services and trauma care systems from local EMS agencies," and, "[a]fter the applicable guidelines or regulations are established by the [A]uthority, a local EMS agency may implement a local plan developed pursuant to [s]ection 1797.250, 1797.254, 1797.257, or 1797.258 unless the [A]uthority determines that the plan does not effectively meet the needs of the persons served and is not consistent with coordinating activities in the geographical area served, or that the plan is not concordant and consistent with applicable guidelines or regulations, or both the guidelines and regulations, established by the [A]uthority." (§ 1797.105, subds. (a) & (b).)

■ The second tier of governance is occupied by "a local EMS agency" (§ 1797.200), which is responsible for, among other things, "(1) planning, implementing, and evaluating an emergency medical services system 'consisting of an organized pattern of readiness and response services based on public and private agreements and operational procedures' (§ 1797.204); (2) developing a formal plan for the system in accordance with the Authority's guidelines and submitting the plan to the Authority on an annual basis (§§ 1797.250, 1797.254); [and] (3) 'consistent with such plan, coordinat[ing] and otherwise facilitat[ing] arrangements necessary to develop the emergency medical services system' (§ 1797.252)." (*County of San Bernardino, supra*, 15 Cal.4th at p. 916.)

"Once a local EMS agency implements its system, all providers of prehospital emergency medical services within its jurisdiction must operate within that system. (See § 1797.178 ['No person or organization shall provide advanced life support or limited advanced life support unless that person or organization is an authorized part of the emergency medical services system of the local EMS agency . . . .'].)" (*County of San Bernardino, supra*, 15 Cal.4th at p. 916.) "Among the mandatory subjects of the local EMS plan is transportation of emergency medical patients. (§§ 1797.76, 1797.103, subd. (c), 1797.70, 1797.72.)" (*Memorial Hospitals Assn. v. Randol* (1995) 38 Cal.App.4th 1300, 1308 [45 Cal.Rptr.2d 547] (hereafter *Randol*).)

■ In 1984, the EMS Act was amended to authorize local EMS agencies to establish EOA's and designate private emergency services providers to be exclusive operators within those areas. ■ "Such authorization was necessary to immunize the agencies from liability under the United States Supreme Court's then recent decision holding that local governments granting monopolies would not be exempt from antitrust laws unless they acted pursuant to ' "clearly articulated and affirmatively expressed" ' state policy." (*County of San Bernardino, supra*, 15 Cal.4th at pp. 917–918, quoting

*Community Communications Co. v. Boulder* (1982) 455 U.S. 40, 51 [70 L.Ed.2d 810, 818–819, 102 S.Ct. 835]; see § 1797.6, subd. (b).)

■ An EOA is "an EMS area or subarea defined by the emergency medical services plan for which a local EMS agency, upon the recommendation of a county, restricts operations to one or more emergency ambulance services or providers of limited advanced life support or advanced life support." (§ 1797.85.) The creation of an EOA is an " 'important administrative tool for designing an EMS system' " because "an EOA permits local EMS agencies to offer private emergency service providers protection from competition in profitable, populous areas in exchange for the obligation to serve unprofitable, more sparsely populated areas." (*Apple Valley, supra,* 17 Cal.4th at p. 759, quoting *County of San Bernardino, supra,* 15 Cal.4th at pp. 931–932.)

Section 1797.224 states in pertinent part: "A local EMS agency may create one or more exclusive operating areas in the development of a local plan, if a competitive process is utilized to select the provider or providers of the services pursuant to the plan. No competitive process is required if the local EMS agency develops or implements a local plan that continues the use of existing providers operating within a local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981. A local EMS agency which elects to create one or more exclusive operating areas in the development of a local plan shall develop and submit for approval to the authority, as part of the local EMS plan, its competitive process for selecting providers and determining the scope of their operations. This plan shall include provisions for a competitive process held at periodic intervals."

With this statutory framework in mind, we turn to the parties' contentions on appeal.

## II

Butte County contends the trial court failed to appreciate that Butte County had established a bifurcated local EMS agency system in which Nor-Cal EMS would be responsible for all local EMS agency functions delineated in its agreement with Butte County, and the Butte County Public Health Department would retain the statutory authority to create EOA's pursuant to section 1797.224. Relying on *Pettye v. City and County of San Francisco* (2004) 118 Cal.App.4th 233 [12 Cal.Rptr.3d 798] (hereafter *Pettye*), Butte County asserts that nothing in the EMS Act precluded it from establishing such a bifurcated system. We disagree.

■ For reasons that follow, we conclude the plain language of the EMS Act precluded Butte County from creating a bifurcated local EMS agency system.[4]

■ The plain language of section 1797.200 states that each county which has chosen to develop an EMS program "shall designate *a* local EMS agency which shall be [(1)] the county health department, [(2)] an agency established and operated by the county, [(3)] an entity with which the county contracts for the purposes of local emergency medical services administration, *or* [(4)] a joint powers agency created for the administration of emergency medical services by agreement between counties or cities and counties pursuant to the provisions of [the Joint Exercise of Powers Act (Gov. Code, § 6500 et seq.)]." (§ 1797.200, italics added.) This local agency would then be responsible for, among other things, "(1) planning, implementing, and evaluating an emergency medical services system 'consisting of an organized pattern of readiness and response services based on public and private agreements and operational procedures' (§ 1797.204); (2) developing a formal plan for the system in accordance with the Authority's guidelines and submitting the plan to the Authority on an annual basis (§§ 1797.250, 1797.254); [and] (3) 'consistent with such plan, coordinat[ing] and otherwise facilitat[ing] arrangements necessary to develop the emergency medical services system' (§ 1797.252)." (*County of San Bernardino, supra,* 15 Cal.4th at p. 916.)

■ By using the words "a local EMS agency" among the four options set forth in the statute, section 1797.200 unambiguously requires the county to designate *one* local EMS agency, not two such agencies sharing the statutory powers and duties of chapter 4 of the EMS Act. Indeed, the purpose of the EMS Act was to replace the preexisting haphazard regulatory system with a simplified two-tiered regulatory system "governing virtually every aspect of prehospital emergency medical services" (*County of San Bernardino, supra,* 15 Cal.4th at p. 915), including the establishment of EOA's and the designation of exclusive operators within those areas (§ 1797.224). This purpose would be thwarted if the second tier of the system could be broken into multiple local EMS agencies, each responsible for a piece of the development of the local EMS plan.

---

[4] Thus, we need not determine whether Butte County is correct that the parties' "lack of precision" in their pleadings and argument before the trial court "blurred the line" between Butte County and the Butte County Public Health Department and caused the trial court to erroneously believe Butte County was trying to retain certain local EMS agency functions and to delegate others to Nor-Cal EMS, as opposed to creating a bifurcated system in which most local EMS agency functions would be carried out by Nor-Cal EMS while the Butte County Public Health Department would retain the power to designate EOA's pursuant to section 1797.224.

Butte County's reliance on *Pettye* is misplaced. That case involved a challenge to an initiative through which San Francisco voters replaced cash grants to homeless recipients with in-kind benefits for housing, utilities, and meals. (*Pettye, supra,* 118 Cal.App.4th at p. 237.) The plaintiffs asserted that, under Welfare and Institutions Code section 17001, only the board of supervisors could " 'adopt standards of aid and care for the indigent and dependent poor,' " and the voters could not amend the standards by initiative. (118 Cal.App.4th at p. 237, fn. 2.) *Pettye* recognized " '[t]he state's plenary power over matters of statewide concern is sufficient authorization for legislation barring local exercise of initiative and referendum as to matters which have been specifically and exclusively delegated to a local legislative body' " (*id.* at p. 242), and acknowledged that "[c]ourts will infer an exclusive delegation to local governing bodies in cases where resort to the initiative and referendum would frustrate the state's regulatory purpose" (*id.* at p. 245). However, *Pettye* held the local initiative power was "not incompatible with the state's interest in ensuring provision of adequate [general assistance] benefits," and "it matter[ed] not to the Legislature whether [general assistance] standards are adopted by the board of supervisors or the voters." (*Id.* at pp. 246–247.) Thus, because Welfare and Institutions Code section 17001 did not "express a 'clear' or 'definite' intent" to restrict the prerogative of initiative, *Pettye* reversed the issuance of a writ of mandate directing the City of San Francisco to continue enforcing the standards previously set by the board of supervisors. (118 Cal.App.4th at pp. 237, 239.)

From this, Butte County concludes that, like the voters in *Pettye*, "Butte County, through its preexisting [local EMS agency], Butte County Public Health Department, retains whatever [local EMS agency] functions have not been explicitly delegated to [Nor-Cal EMS] because section 1797.200 does not expressly state that [Butte County] cannot reserve its power."

The flaw in this argument is evident from the very statement of it. Unlike *Pettye*, this case does not involve our "duty to jealously guard the prerogative of initiative" by liberally construing and upholding that power unless there is a clear and definite intent to restrict it at the local level. (*Pettye, supra,* 118 Cal.App.4th at p. 237; see also *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775–776 [38 Cal.Rptr.2d 699, 889 P.2d 1019].) As we have already noted, by providing for "*a* local EMS agency," section 1797.200 authorizes Butte County to designate only *one* local EMS agency, not two such agencies.

Under Butte County's reasoning, nothing would prevent it from designating three, or four, or even more local EMS agencies, because each time it designates a local EMS agency to perform one function under the EMS Act, the county would retain the power to designate another local EMS agency to perform another function, and another, and another, until it has a separate

local EMS agency performing each function prescribed by chapter 4 of the EMS Act. But this would certainly frustrate an overarching purpose of the EMS Act, which was to simplify the previously haphazard regulatory system by "provid[ing] the state with a statewide system for emergency medical services by establishing [the Authority], which is responsible for the coordination and integration of all state activities concerning emergency medical services." (§ 1797.1.)

Simply put, in enacting section 1797.200, the Legislature did not intend for the Authority to have to keep track of which local EMS agency in which county was responsible for which local EMS agency functions; instead, the Legislature intended for *one* local EMS agency to be responsible for all such functions.[5]

We reject Butte County's argument that the Authority's position that the EMS Act "does not allow for an individual county to retain some duties while delegating others to its local EMS agency" amounts to an "underground regulation" which "cannot be enforced against Butte County." In part IV of this opinion, *post*, we will address the law relating to invalid regulations. Suffice it to say for now that we do not perceive the Authority's position that designation of a local EMS agency under section 1797.200 "is an all or nothing approach" as a regulation, but instead perceive it as a "direct application of the law" not subject to the Administrative Procedure Act. (See *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 574 [59 Cal.Rptr.2d 186, 927 P.2d 296], citing *Liquid Chemical Corp. v. Department of Health Services* (1991) 227 Cal.App.3d 1682, 1696, 1698 [279 Cal.Rptr. 103].)

III

The heart of the dispute between the parties is Butte County's assertion that the Authority lacks the statutory authority to refuse to recognize EOA's created by local EMS agencies pursuant to the grandfathering provision of section 1797.224. More colorfully, Butte County claims that the Authority possesses an "inflated view of its own authority" which has "resulted in a

---

[5] Butte County argues that, even if such a bifurcated system is not authorized by the EMS Act, then all local EMS agency powers would be retained by the Butte County Public Health Department because Butte County's "attempt to partially delegate some of [the Butte County Public Health Department's local EMS agency] duties to Nor-Cal [EMS] would have been null and void at inception." We need not address this contention because, as First Responder points out, both Nor-Cal EMS and the Butte County Public Health Department submitted to the Authority a local EMS plan for Butte County that included EOA's created through the grandfathering provision of section 1797.224. Accordingly, for purposes of this appeal, it makes no difference which agency, Nor-Cal EMS or the Butte County Public Health Department, is Butte County's local EMS agency. But it bears repeating that the EMS Act allows Butte County one local EMS agency, not multiple such agencies.

paternalistic attitude towards counties, and has led to unauthorized and repeated intrusions into Butte County's internal affairs." First Responder makes the same basic claim: "[T]he EMS Act grants no power to the [Authority] to review or disapprove a local determination of grandfathering eligibility."[6] According to both Butte County and First Responder, section 1797.224 unambiguously provides that the local EMS agency that elects to create one or more EOA's in the development of a local plan shall develop and submit for approval to the Authority, as part of the local EMS plan, *its competitive process* for selecting providers and determining the scope of their operations, and because the Butte County Public Health Department did not use a competitive process to designate EOA's, but instead utilized the grandfathering provision of section 1797.224, no Authority approval was required.

The Authority argues it does possess the statutory authority to approve or reject a local EMS plan designating EOA's. In its view, "[s]ection 1797.224 specifically requires the inclusion of any EOAs and granting to providers of exclusive operating rights within EOAs, regardless of whether that granting is through a competitive process or grandfathering, be included in a county's local EMS plan. Because the establishment and existence of EOAs and the granting of exclusive operating rights to certain EMS providers within those EOAs is part and parcel of the transportation portion [of] a local EMS plan, the [Authority] has the discretion to approve or deny any proposed EOAs and the placement, through grandfathering or a competitive bid process, of providers into those EOAs."[7]

---

[6] First Responder claims, however, that it is Butte County, not the Butte County Public Health Department, that possesses the local EMS agency authority to create EOA's pursuant to section 1797.224. Butte County, on the other hand, has disavowed any claim to local EMS agency powers, but instead says the Butte County Public Health Department is the local EMS agency responsible for establishing EOA's in Butte County. On this point, section 1797.200 is plain: "Each county developing [an emergency medical services program] shall designate a local EMS agency which shall be the county health department, an agency established and operated by the county, an entity with which the county contracts for the purposes of local emergency medical services administration, or a joint powers agency created for the administration of emergency medical services by agreement between counties or cities and counties pursuant to the provisions of Chapter 5 (commencing with Section 6500) of Division 7 of Title 1 of the Government Code." Accordingly, Butte County cannot be Butte County's local EMS agency. "It is apparent that, by requiring the EOA decision to be made by the local agency, which is in turn required to have a physician as its medical director, the Legislature sought to make the EOA decision a professional, not a political, determination." (*Randol, supra*, 38 Cal.App.4th at p. 1310.) Therefore, we will assume throughout this opinion that First Responder's references to "Butte County" are references to the Butte County Public Health Department.

[7] Butte County contends a 1992 letter from Daniel R. Smiley, chief deputy director of the Authority, to the Sonoma County Public Health Department, saying that "[t]he decision as to grandfathering a provider into an exclusive operating area is left to the county for their determination," should bar the Authority from changing its position with respect to Butte

■ To resolve this conflict, we apply well-established principles of statutory interpretation. " 'When construing a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citation.] 'In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.' [Citation.] At the same time, 'we do not consider . . . statutory language in isolation.' [Citation.] Instead, we 'examine the entire substance of the statute in order to determine the scope and purpose of the provision, construing its words in context and harmonizing its various parts.' [Citation.] Moreover, we ' "read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' " ' " (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043 [12 Cal.Rptr.3d 343, 88 P.3d 71]; see *San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822, 831 [95 Cal.Rptr.3d 164, 209 P.3d 73].)

■ Section 1797.224 unambiguously authorizes a local EMS agency to create one or more EOA's in the development of a local plan if either (1) a competitive process is used to select the exclusive providers, or (2) the local plan continues use of the existing providers operating within a local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981. If the local EMS agency creates EOA's in the development of a local plan, such agency must submit to the Authority for its approval the competitive process used for selecting the exclusive providers and determining the scope of their operations.

This makes perfect sense if a competitive process is used to select the exclusive providers. However, what if the local EMS agency does not use a competitive process, and instead continues the use of existing providers operating within the local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981? Given a literal reading, section 1797.224 would require the local EMS agency to submit to the Authority for its approval the competitive process used to select the exclusive providers even if the local EMS agency chose to continue using existing providers operating within the local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981.

To avoid the obvious absurdity of such a reading, Butte County and First Responder would have us conclude that, when the local EMS agency

County's EOA's. The contention is not supported by citation to any legal authority and is thus forfeited as improperly presented. (Cal. Rules of Court, rule 8.204(a)(1)(B).) In any event, we see no reason why a position taken years ago with respect to Sonoma County would operate to preclude the Authority from changing its position with respect to Butte County.

continues the use of existing providers operating within the local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981, there is no competitive process to submit to the Authority for its approval and, therefore, the local EMS agency's determination with respect to grandfathering in the existing providers is not subject to Authority approval. But we cannot read section 1797.224 in isolation; instead, we are required to read the statute with reference to the entire statutory scheme so that the EMS Act as a whole may be harmonized and retain effectiveness. (*State Farm Mutual Automobile Ins. Co. v. Garamendi, supra*, 32 Cal.4th at p. 1043.)

As the Authority points out, a local EMS agency "shall annually submit an emergency medical services plan for the EMS area to the [A]uthority" (§ 1797.254), and "[a]mong the mandatory subjects of the local EMS plan is transportation of emergency medical patients. (§§ 1797.76, 1797.103, subd. (c), 1797.70, 1797.72.)" (*Randol, supra*, 38 Cal.App.4th at p. 1308.) And "a local EMS agency may implement a local plan developed pursuant to [s]ection 1797.250, 1797.254, 1797.257, or 1797.258 *unless the [A]uthority determines that the plan does not effectively meet the needs of the persons served and is not consistent with coordinating activities in the geographical area served, or that the plan is not concordant and consistent with applicable guidelines or regulations, or both the guidelines and regulations, established by the [A]uthority*." (§ 1797.105, subd. (b), italics added.) Accordingly, the Authority has the statutory power to promulgate regulations and "develop planning and implementation guidelines for emergency medical services systems," including guidelines which address "[t]ransportation" (§ 1797.103), and to reject a local EMS plan if "the plan is not concordant and consistent with applicable guidelines or regulations, or both the guidelines and regulations, established by the [A]uthority" (§ 1797.105, subd. (b)).

 Indeed, section 1797.224 was added to the EMS Act in order to "prescribe and exercise the degree of *state direction and supervision* over emergency medical services as will provide for state action immunity under federal antitrust laws for activities undertaken by local governmental entities in carrying out their prescribed functions under this division." (§ 1797.6, subd. (b), italics added.) "Under the state action immunity doctrine, a local government may restrict trade without violating the antitrust laws if the state has 'clearly articulated' and affirmatively expressed its intention to allow the municipality to replace competition with regulation or monopoly power." (*Redwood Empire Life Support v. County of Sonoma* (9th Cir. 1999) 190 F.3d 949, 953 (hereafter *Redwood Empire*), quoting *A-1 Ambulance Service, Inc. v. County of Monterey* (9th Cir. 1996) 90 F.3d 333, 336.)

Here, the designation of an EOA would constitute an illegal "restraint of trade" (15 U.S.C. § 1), except for the fact that the state has articulated its intent to allow local EMS agencies to designate EOA's through either a competitive process or grandfathering. (*Redwood Empire, supra*, 190 F.3d at p. 953.)

We agree with the Authority that the "state direction and supervision" envisioned by section 1797.6, subdivision (b) "comes through the [Authority's] review of local EMS plans submitted by local EMS agencies." To conclude that, although the Legislature intended to provide for state direction and supervision over the creation of EOA's (§ 1797.6, subd. (b)), and while EOA's can be created either through a competitive process or grandfathering (§ 1797.224), the Legislature nevertheless intended the Authority should have no power to provide direction or supervision over EOA's created through the grandfathering provision of section 1797.224 would make no sense, as a matter of law or common sense.

 We thus conclude that the Authority has the statutory authority to review a local EMS agency's creation of an EOA as part of the transportation portion of the local EMS plan, regardless of whether the EOA was created through a competitive process or grandfathering, and then to reject the local EMS plan if it is not "concordant and consistent with applicable guidelines or regulations, or both the guidelines and regulations, established by the [A]uthority." (§ 1797.105, subd. (b).) Our conclusion is consistent with the legislative history of section 1797.224, which indicates that this provision was intended to require "an EMS agency electing to establish [EOA's] to submit its process for provider selection in its EMS plan, and for determining the scope of provider operations." (Sen. Com. on Health and Human Services, Analysis of Assem. Bill No. 3153 (1984–1985 Reg. Sess.) p. 1; see also Assem. Health Com., Analysis of Assem. Bill No. 3153 (1984–1985 Reg. Sess.) p. 2 ["the process by which an [EOA] is defined and the process by which a provider is selected must be set forth in the EMS plan and approved by the [Authority]"].)

## IV

Butte County contends that, even if the Authority had the power "to reject EOAs created via grandfathering," the disapproval of the Butte County EOA's was a nullity because it was based on "invalid, underground regulations."

 " 'If a policy or procedure falls within the definition of a "regulation" within the meaning of the APA [(Administrative Procedure Act)], the promulgating agency must comply with the procedures for formalizing such regulation, which include public notice and approval by the Office of Administrative Law (OAL).' [Citation.]" (*Capen v. Shewry* (2007) 155 Cal.App.4th 378, 386 [65 Cal.Rptr.3d 890] (hereafter *Capen*).) A regulation that " 'substantially fails to comply with these requirements may be judicially declared invalid. [Citation.]' " (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 333 [42 Cal.Rptr.3d 47, 132 P.3d 249] (hereafter *Morning Star*).)

"A regulation subject to the APA . . . has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. [Citation.] Second, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' [Citation.]" (*Tidewater Marine Western, Inc. v. Bradshaw, supra*, 14 Cal.4th at p. 571 (hereafter *Tidewater*).)

Butte County first argues that the EMS Act is ambiguous as to whether the Authority possesses the statutory power to reject the creation of EOA's; thus, the Authority's "interpretation of its own authority, which is based on its interpretation of the [EMS] Act, is itself an underground regulation, and cannot be enforced against Butte County's [local EMS agencies] absent a formal rulemaking pursuant to the APA." To the contrary, as we have already explained, the EMS Act provides the Authority with the statutory power to reject the creation of EOA's submitted as part of a local EMS plan. That the Authority chose to exercise this power does not render its action a "regulation" simply because, before acting, it interpreted the statutory scheme as conferring such power. Were this the case, all agency actions would be transformed into "regulations" where the power to act may not be crystal clear.

Butte County takes issue with the Authority's statement that "[t]he creation of EOAs outside the competitive process through the use of existing providers operating in the same manner and scope is called 'grandfathering.' " According to Butte County, "section 1797.224 does not use the term 'same' or any other term of similar meaning" and, thus, the Authority's "interpretation of the statute as requiring the 'same' manner and scope of services since 1981" amounts to "an invalid, unenforceable underground regulation." Not

so. Section 1797.224 provides that "[n]o competitive process is required if the local EMS agency develops or implements a local plan that continues the use of existing providers operating within a local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981." That the existing providers are required to have operated in the *same* manner and scope is "the only reasonable interpretation" of this provision; hence, the language of which Butte County complains does not constitute a regulation subject to the procedures of the APA (Administrative Procedure Act; Gov. Code, § 11340 et seq.). (See *Tidewater, supra*, 14 Cal.4th at p. 574; see also *Liquid Chemical Corp. v. Department of Health Services, supra*, 227 Cal.App.3d at p. 1696.)

The Authority's interpretation of when a change in manner and scope would occur under section 1797.224 also cited the declaration of Daniel R. Smiley, chief deputy director of the Authority, who said: "A change in manner and scope, defeating a county's ability to grandfather existing providers into EOAs, may occur in the following instances: (1) where there is a change in the number of providers in the area; (2) where there are interruptions in the services provided by one or more providers in the area; (3) where there is a change in the economic distribution of calls between providers in the area; (4) where there is a change in ownership of one of the providers in the area; (5) where there is a change in the geographical boundaries of the area; (6) where areas or subareas are combined or splintered; and (7) where there is an approval by the local EMS agency of a new provider in the area. A change in manner and scope will not occur in the following situations: (1) an upgrade in ambulance service from basic life support (BLS) to advanced life support (ALS); (2) the subcontracting of a grandfathered provider with another provider for minor activities within an area that does not alter the manner and scope of operations, is approved by the local EMS agency, and is part of the county's EMS plan; and (3) the response of providers into an area for mutual aid or instant aid in the event of significant events or disaster situations."

Smiley's declaration also stated that "[c]hanges in ownership of EMS providers can result in a change in manner and scope. Where one company purchases another, as evidenced by a stock transfer, purchase of goodwill, transfer of liabilities, and transfer of accounts receivable, no change in manner and scope occurs. However, there is a change in manner and scope if one company purchases only the assets of another company. In an assets only purchase situation, one ambulance company goes out of business and another provider purchases its rolling stock and other capital equipment. Manner and scope have changed in this situation because one provider has ceased operations and [an]other has begun operations."

We agree with Butte County that these statements constitute a generally applicable interpretation of the "manner and scope" language of section 1797.224. The Authority argues to the contrary, asserting the statements are "nothing more than a listing of the [Authority's] prior decisions in specific cases and advice letters and not a rule of general application used by the [Authority] in interpreting the EMS Act" and, thus, do not amount to regulations subject to the APA. (See *Tidewater, supra,* 14 Cal.4th at p. 572.) However, the Authority cites no evidence in the record to support this position. In fact, the Authority relied on these statements in coming to its conclusion regarding Butte County's EOA's, which indicates that the Authority's interpretation of "manner and scope" was intended for general application.

The Authority rejected Nor-Cal EMS's designation of EOA's because of a "lack of pertinent and sufficient supporting evidence" that the existing EMS providers were in fact operating in the manner and scope in which the services had been provided since January 1, 1981. The Authority further said: "Since that date, three services in the Chico, Oroville, and Paradise areas have changed ownership, and, in the Paradise area, three different owners have operated the ambulance service. Sufficient documentation has never been submitted to the [Authority] to verify whether these purchases were reorganizations of the existing entity. [¶] In addition, in researching this issue further, it appears that a significant boundary change was made to the [Paradise area]. In 1987, the Butte College campus was incorporated into the zone, adding a daytime population of over 10,000 students. Absent substantive supporting documentation over 13 years, these changes appear to have further modified the 'manner and scope' of operations, as described in [section 1797.224], and would preclude granting exclusivity to these providers in those areas." Accordingly, the Authority relied on factors (4) and (5) of its statement interpreting when a change in manner and scope may occur, i.e., "a change in ownership of one of the providers in the area," and "a change in the geographical boundaries of the area," and further relied on its statement setting forth the circumstances in which a change in ownership either does or does not "result in a change in manner and scope."

 We thus conclude that the Authority's interpretation of the "manner and scope" language of section 1797.224 is a generally applicable policy subject to the rulemaking procedures of the APA. Because the Authority did not comply with those procedures, this interpretive regulation is void and not entitled to any deference. (See *Tidewater, supra,* 14 Cal.4th at p. 577; *Capen, supra,* 155 Cal.App.4th at p. 389.) If the Authority wishes to validate this interpretation for future cases, it may do so by ensuring compliance with the APA. (See *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198, 201 [149 Cal.Rptr. 1, 583 P.2d 744] (hereafter *Armistead*).)

## V

The fact that the Authority relied on an invalid regulation in rejecting the EOA's does not require reversal. (See *Tidewater, supra*, 14 Cal.4th at pp. 561 ["We conclude that these interpretive policies do constitute regulations and therefore are void because they were not adopted in accordance with the APA. Nevertheless, we conclude that the agency properly exercised its enforcement jurisdiction . . . ."], 577 ["If, when we agreed with an agency's application of a controlling law, we nevertheless rejected that application simply because the agency failed to comply with the APA, then we would undermine the legal force of the controlling law."].)

Although we must void an interpretive regulation that does not comply with the APA procedures, we may resolve any ambiguity that gave rise to the Authority's interpretation as long as we are not required to defer to the Authority's interpretation. (*Capen, supra*, 155 Cal.App.4th at p. 391, citing *Armistead, supra*, 22 Cal.3d 198, and *Tidewater, supra*, 14 Cal.4th 557.) "In this regard the courts generally distinguish between quasi-legislative rules, which involve the exercise of a delegated lawmaking power and come with a strong presumption of regularity, and an agency's interpretation of a statute, which is due a lesser degree of judicial deference. [Citations.] [¶] 'Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of a delegated lawmaking power; instead it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts. But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this "expertise," expressed as an interpretation . . . that is the source of the presumptive value of the agency's views. An important corollary of agency interpretations, however, is their diminished power to bind. Because an interpretation is an agency's legal opinion, however "expert," rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference.' [Citation.]" (*Capen, supra*, 155 Cal.App.4th at pp. 391–392, quoting *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

Here, the Authority has been granted the power to issue "rules and regulations as may be reasonable and proper to carry out the purposes and intent of [the EMS Act] and to enable the [A]uthority to exercise the powers and perform the duties conferred upon it by [the EMS Act] not inconsistent

with any of the provisions of any statute of this state." (§ 1797.107.) The Authority possesses the power to reject a local EMS agency's designation of EOA's through the grandfathering provision of section 1797.224, and thus may issue regulations interpreting the "manner and scope" language contained in that provision, so long as it follows the procedures of the APA. This may very well require "administrative expertise in the first instance," such that this court may not be in "as good a position as the [Authority], or almost so, to interpret" when a particular change in ambulance service constitutes a change in "manner and scope" within the meaning of section 1797.224. (*Morning Star, supra*, 38 Cal.4th at pp. 340–341.)

However, the resolution of this appeal does not require us to interpret the Authority's language; instead, it requires us to determine whether the Authority was correct to reject Nor-Cal EMS's designation of EOA's based on changes in ownership in the existing ambulance providers and a change in boundary between two zones of operation until such time that Nor-Cal EMS provided sufficient documentation to establish these events did not amount to a change in the "manner and scope in which the services have been provided without interruption since January 1, 1981." (§ 1797.224.)

There can be no doubt that a change in manner and scope under section 1797.224 can occur when one provider ceases operations and another provider begins operations in its place; nor do we have any trouble concluding that a change in manner and scope can occur when there is a significant boundary change between areas of operation.

We need not determine whether the changes in ownership and boundary change in this case amounted to a change in manner and scope. We simply conclude that the Authority did not abuse its discretion by rejecting the designation of EOA's based on a lack of information provided by Nor-Cal EMS. Assuming Butte County chooses to retain Nor-Cal EMS as its local EMS agency, nothing in this opinion should be construed as preventing Nor-Cal EMS from submitting for the Authority's consideration a revised local EMS plan incorporating the EOA's, with the documentation requested by the Authority.

VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1175.

## DISPOSITION

The judgment is affirmed.

Nicholson, J., and Raye, J., concurred.