Filed 11/14/24  In re J.G. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.G. et al., Persons Coming Under the Juvenile Court Law. | B333717 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19LJJP00852C-D) |
| Plaintiff and Respondent, | |
| v. | |
| JOSE G. ET AL., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra L. Gonzales, Judge Pro Tem.  Affirmed.

Anuradha Khemka, under appointment by the Court of Appeal, for Defendant and Appellant Jose G.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant Arianna V.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

—————————————————————————

Arianna V. (mother) and Jose G. (father) challenge the juvenile court's findings and orders terminating parental rights over their children, J.G. and J.V.,[1] under Welfare and Institutions Code section 300.[2]  Father argues the juvenile court abused its discretion in denying his request for a bonding study, and both parents argue the court erred in finding the parental-benefit exception to the termination of parental rights did not apply.  The parents also argue the inquiry of the juvenile court and the Los Angeles County Department of Children and Family Services (DCFS) under the Indian Child Welfare Act (ICWA) was insufficient.  We affirm the court's orders.

---

[1]     Father is the father of J.G. only and appeals from the order terminating his parental rights over J.G.  Mother is the mother of J.G. and J.V. and appeals from the order terminating her parental rights over both children.

[2]     All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.    Detention, Jurisdiction, and Disposition**

Mother and father are the parents of J.G. (born 2017). J.G. has three maternal half-siblings: J.V. (born 2007), A.V. (born 2006), and B.V. (born 2005).[3] Their father is deceased.

In October 2019, DCFS received a report that father went to mother's apartment, punched her on her back, and ran away. The referral alleged there had been previous incidents of domestic violence. A social worker interviewed J.V. about one week after the incident. J.V. stated he had seen father hit mother before "with his hands open" and push her. J.V. reported an incident where father hit mother with "open hands" because father was trying to take J.G. out of the home against mother's wishes.

In November 2019, J.G., J.V., and their siblings were removed from mother and father. J.G., J.V., and their sibling A.V. were placed with maternal aunt, L.O.[4] A few days later, DCFS filed a section 300 petition alleging J.G., J.V., and their siblings were at risk because of the parents' history of domestic violence in the presence of the children. At the detention hearing in late November 2019, the juvenile court ordered the children released to mother and detained J.G. from father. In December 2019, father appeared at a hearing for a temporary restraining order sought by mother against him. The court ordered monitored visitation for father with J.G. at the hearing.

---

[3]    A.V. and B.V. are not subjects of this appeal. In the sections below, we summarize the facts and evidence relevant to mother's and father's appeals, focusing on J.G.'s and J.V.'s histories.

[4]    Their other sibling, B.V. was placed with a different maternal aunt, S.V.

J.V. told a dependency investigator he believed father was using drugs because every time he went to the family's home, "he looks like he's on something." Two days after the hearing on mother's temporary restraining order, father tested positive for amphetamines and methamphetamines. In January 2020, DCFS filed a first amended petition adding an allegation regarding father's amphetamine and methamphetamine use and mother's failure to protect J.G. from father's drug use. Father failed to appear for many scheduled drug tests and tested positive three more times during the dependency proceedings.

The social worker arranged for monitored visits between father and J.G. to take place twice a week for three hours, beginning in July 2020. During a visit with J.G. in September 2020, father admitted to the social worker he used "crystal meth" two days before.

In November 2020, the juvenile court ordered J.G., J.V., and their siblings detained from mother after finding she failed to comply with prior court orders. The court ordered monitored visits for mother. J.G., J.V., and A.V. were again placed with maternal aunt L.O. In December 2020, DCFS filed a second amended petition adding allegations involving mother's use of illicit drugs.

DCFS reported mother visited with the children weekly and was observed to have a strong bond with them. Father was also visiting with J.G. weekly and was reported to be attentive to her and her needs.

At the adjudication hearing held in February 2021, the juvenile court sustained several counts of the second amended petition, including the counts based on father and mother

engaging in violent altercations in the presence of the children, mother's drug use, and father's substance abuse.

At the disposition hearing held the following month, the juvenile court declared the children dependents of the court under section 300 and ordered them removed from mother and father. The court ordered reunification services for mother and father. The court further ordered monitored visits for father with J.G. and for mother with all the children.

## B.     First Reunification Period

In September 2021, DCFS reported father was having visits with J.G. twice per week, monitored by paternal grandmother. During a meeting with the social worker, father stated it had been "hard for him to stay away from drugs and that he had relapsed a couple of times." DCFS reported father was consistent with his visitation during this period.

At a hearing in September 2021, the juvenile court granted mother unmonitored day visits with her three oldest children, including J.V. The children reported visits were going well. In November 2021, the juvenile court granted mother unmonitored visits with J.G. and overnight visits with all children once DCFS conducted a home assessment of mother's apartment.

At the six-month review hearing in December 2021, the juvenile court found the parents' progress with their case plans was not substantial but continued reunification services for them.

## C.     Second Reunification Period

In early December 2021, DCFS canceled mother's overnight visits because she had failed to comply with the juvenile court's orders. J.G.'s and J.V.'s caregiver, L.O., informed the social

5

worker that mother would sleep during visits with the children while "the children [did] their own thing." In February 2022, DCFS reinstated mother's overnight visits after she attended individual therapy and appeared for drug testing.

Caregivers S.V. and L.O. reported mother had a habit of leaving the children with maternal grandmother while she went "out and about." In March 2022, mother's request to have the children for their spring break from school was granted. When S.V. went to maternal grandmother's home one night during spring break, mother was not there. J.G. and J.V. were sleeping, and maternal grandmother was not aware mother had left the home.

J.V. told the social worker that mother usually left him and J.G. at maternal grandmother's home without saying where she was going. J.V. stated mother was not around much even when they had visits with her. In April 2022, mother's overnight visits were cancelled for one month while these concerns were investigated. DCFS noted in its report for the 12-month hearing that J.G. and J.V. wanted to reunify with mother.

As to father, paternal grandmother continued monitoring his visits with J.G. Father visited twice a week. At the 12-month review hearing, the juvenile court found mother's and father's progress with their case plans was substantial and continued reunification services.

**D.    Third Reunification Period**

The social worker met with mother's children in late July 2022. A.V. told the social worker she and her siblings had not spent time with mother at her apartment for an overnight visit for at least a couple of months. J.V. said mother typically left

6

him and J.G. at maternal grandmother's home and would not return for a day or two, including on an occasion when he tested positive for a "health virus." J.V. told the social worker, "'I don't want to go live with mom. She cannot handle all four children. I want to live with my [maternal] aunt [M.M.] she will be there for my sister [J.G.] and me.'" J.G. told the social worker she wanted to live with mother because she "'love[d] her'" and wanted to "'stay with [mother's] friend.'"

A few days later, L.O. reported that J.V. chose to stay with her and not go with mother for a weekend overnight visit. L.O. also stated that mother tried to bring J.G. back a day early from a weekend overnight visit. In August 2022, J.G. and J.V. were placed in maternal aunt M.M.'s home.

Mother tested positive twice for methamphetamine in October 2022. In November 2022, the juvenile court reverted mother's visitation back to monitored visits and rescinded overnight visits. Mother tested positive for methamphetamine again in late December 2022.

DCFS noted in its report for the 18-month review hearing that J.G.'s and J.V.'s current caregiver, M.M., wanted to adopt them and provide a permanent home. M.M. reported mother consistently visited J.V. and J.G. on Fridays and some Wednesdays.

As to father, paternal grandmother reported father had consistent visitation twice a week with J.G. and spent quality time with her. During an announced visit, the social worker observed father engage and play with J.G. It was noted that J.G. had told her caregiver that on some occasions during visits, father was at work and she stayed with paternal grandmother.

At the 18-month review hearing on February 1, 2023, the juvenile court found mother's and father's progress with their case plans was not substantial and terminated reunification services. Father's counsel requested that a bonding study be completed between J.G. and the parents. The court denied the request because it did not think it was "necessary at this time."

Mother and father each filed a notice of intent to file a writ petition regarding the February 1, 2023, hearing. The matters were deemed nonoperative after the parents' counsel filed letters pursuant to *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, and the parents failed to file supplemental briefs.[5]

## E.    Termination of Parental Rights

J.G.'s and J.V.'s caregiver, M.M., informed the social worker mother was not consistent with weekend visitation but did visit during the week. M.M. consistently stated there were no changes in J.G.'s or J.V.'s behaviors and they did not appear surprised when a visit was cancelled. J.V. said the visits with mother were "fine," and J.G. reported she did not remember what she and mother did during visits. When J.G. was asked by the social worker how visits with mother were, she responded, "'[F]ine, she gives cool toys.'"

In May 2023, father reported during a phone call that he had not missed any visits with J.G., but when the social worker asked father what days and times he visited, he was unable to recall. Paternal grandmother whispered the times and days for

---

[5]    On our own motion, we take judicial notice of our records regarding the writ proceeding initiated by father and mother following the court's order setting a section 366.26 hearing (case no. B326791); the proceeding was deemed a nonoperative writ in May 2023.

visitation to father. J.G. told her caregiver, assigned therapist, and the social worker that father was not always present during visits.

J.G.'s caregiver mentioned concerns to J.G.'s therapist about J.G. having urinary accidents and coming back with changed clothes after visits with father. J.G. told her therapist that father tickled her in a room, and she urinated on herself. The therapist noted J.G. appeared open to discuss other topics, but she was obscure when discussing father or visits. About a week later, the therapist met with J.G., and J.G. was again vague about visits with father. J.G.'s caregiver told the social worker that J.G. did not have accidents in the placement home. Father denied tickling J.G. Paternal grandmother denied having any knowledge of J.G. having urinary accidents during visits with father.

In a status review report filed July 2023, DCFS noted that J.G.'s and J.V.'s caregivers developed a loving relationship with them, and the caregivers expressed their desire to provide the children with a loving and stable home. J.V. twice told the social worker he wanted to be adopted by maternal aunt M.M. J.G. was too young to make a statement about permanency.

At a July 28, 2023, section 366.26 hearing, the juvenile court ordered, at J.G.'s counsel's request, that paternal grandmother no longer monitor father's visits due to concerns of possible sexual abuse and paternal grandmother not always being present during visits. The court continued the hearing.

After that, Father's visits were moved to DCFS's office, and he visited twice per week. Father would arrive with food and many toys for J.G., though the social worker repeatedly told him J.G. did not have room for additional toys at her home. The

social worker noted that father seemed to have boundary issues, and J.G. was aware that her father would buy her anything she wanted.  Father generally acted appropriately and was engaged in activities with J.G.  However, J.G. seemed to care more about paternal grandmother than father.  J.G. continuously asked for paternal grandmother and was distressed by her absence, at times crying.  J.G. continually asked to call paternal grandmother during and between visits.  In contrast, J.G. would say goodbye to father without issue and did not appear disturbed when she did not see him.  DCFS assessed that it did not appear father had a significant relationship with J.G. outside of the monitored visits.

J.G. expressed her feelings during a phone call with father that occurred in October 2023.  According to J.G.'s caregiver, J.G. asked if she could see paternal grandmother.  Father told J.G. she could, but he could not be there.  J.G. said, "'I choose grandma.'"

As time went on, there was evidence that J.G. also missed father.  At a visit in November 2023, J.G. told father that she missed him while she was at school and cried, but she smiled after she remembered she was going to see him.

Because father often catered to J.G.'s wishes, he sometimes disagreed with her caregiver.  In mid-November 2023, J.G.'s caregiver reported that during a phone call, father asked J.G. when the last time she showered was and when she was going to shower again.  The caregiver reminded J.G. she was going to shower that night.  J.G. said she did not want to, and father told her she did not have to shower.  The next day, the social worker spoke with J.G.'s therapist.  The therapist reported the caregiver's structure was appropriate and benefitted J.G. in

10

meeting her goals. The therapist opined that if father's "poor boundaries" were removed, J.G.'s behaviors would "overall improve."

## F. Section 366.26 Permanency Planning Hearing

After several continuances and 10 hearings, the section 366.26 hearing was held on December 5, 2023.[6] Father's counsel requested another continuance and argued a "bonding study would be appropriate and beneficial in this case."

The juvenile court denied the request for a continuance "for a variety of reasons." At the previous hearing, the court was clear there would be no further continuances and father's counsel assured the court father would be ready to proceed. DCFS had provided "very thorough reports of visitation both by mother and father, and the quality of those visits." The court indicated it did not believe a bonding study was required for it to make its determination. The court also stated father "should have made [the request] many months ago" if he believed a bonding study was necessary or beneficial.

Mother argued the parental-benefit exception to adoption applied to her and both J.G. and J.V. Father argued the parental-benefit exception to adoption applied to him and J.G. The juvenile court admitted the stipulated testimony of paternal grandmother that "if called to testify, paternal grandmother would testify that the visits she monitored for father, father was present and consistent for those visits." The court also admitted into evidence the stipulated testimony of J.G., which included her

---

[6] A.V. and B.V. had other permanent plans and were not parties to the section 366.26 permanency planning hearing.

11

statement that she loved her parents and wanted to keep visiting them.

The juvenile court found mother and father did not establish the parental-benefit exception applied. The court found the parents maintained regular visitation, but neither established a beneficial relationship with the children. And the court determined that terminating the parent-child relationship would not be detrimental to the children. The court found no exception to adoption applied as to J.G. or J.V. and terminated parental rights.

Mother and father appealed.

## G.    ICWA Proceedings

Mother filed a parental notification of Indian status (ICWA-020) form in November 2019, indicating she had no Indian ancestry as far as she knew. At the November 2019 detention hearing, the juvenile court noted it had mother's ICWA-020 form and found it had no reason to know ICWA applied as to mother. DCFS inquired of mother in early December 2019 regarding Indian ancestry, and mother denied any knowledge of Indian ancestry pertaining to herself or the children's fathers.

In December 2019, father filed an ICWA-020 form, indicating he had no Indian ancestry as far as he knew. At the December 2019 hearing on mother's temporary restraining order request, the juvenile court noted father filed the form and found ICWA did not apply in J.G.'s case. DCFS inquired of father regarding any Indian heritage the next day, and father denied any knowledge as to Indian ancestry. Father reported he was born in Mexico.

In September 2022, the juvenile court ordered further ICWA inquiry reports to be completed. In fall 2022, DCFS inquired with the three maternal aunts who were or had been caregivers—L.O., S.V., and M.M.—and with maternal grandmother, and all denied Indian ancestry. Each maternal aunt also completed an Indian ancestry questionnaire provided by DCFS stating they had no information regarding any Indian ancestry. In November 2022, the social worker interviewed father regarding ICWA, and father again denied having Indian heritage.

In July 2023, DCFS reported it spoke with "maternal and paternal family members and inquired about ICWA," and all family members denied Indian heritage.

At the initial section 366.26 hearing on July 28, 2023, the court directly inquired of father and paternal grandmother regarding ICWA at DCFS's counsel's request. Father and paternal grandmother each denied any Native American ancestry. At the December 5, 2023, section 366.26 hearing, the court again found there was no reason to know ICWA applied to the children.

## DISCUSSION

### A. The Juvenile Court Did Not Abuse its Discretion by Declining to Order a Bonding Study

Father argues the juvenile court abused its discretion in denying his requests for a bonding study made on February 1 and December 5, 2023. We are not persuaded.

13

1.	*Legal Principles and Standard of Review*

Pursuant to Evidence Code section 730, a juvenile court may appoint an expert to study the bond between a parent and child. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) A bonding study can be relevant to determining whether the beneficial parent-child exception to termination of parental rights applies. (See *In re S.R.* (2009) 173 Cal.App.4th 864, 869.) However, "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 (*Lorenzo C.*).)

We review the juvenile court's order denying a request for a bonding study for an abuse of discretion. (*Lorenzo C., supra*, 54 Cal.App.4th at p. 1341.) We ask "whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*Ibid.*)

2.	*Father Forfeited His Challenge to the February 1, 2023, Denial of a Bonding Study*

DCFS asserts father cannot challenge the February 1, 2023, denial of his bonding study request because he did not challenge the order by a petition for extraordinary writ as required by section 366.26, subdivision (l).[7] Following the denial

---

[7]	Section 366.26, subdivision (l), states: "(1) An order by the court that a hearing pursuant to this section be held is not appealable at any time unless all of the following apply: [¶] (A) A petition for extraordinary writ review was filed in a timely manner. [¶] (B) The petition substantively addressed the specific issues to be challenged and supported that challenge by an adequate record. [¶] (C) The petition for extraordinary writ review was summarily denied or

of father's request for a bonding study at the February 1 hearing, where the section 366.26 permanency planning hearing was set, father's counsel filed a notice of intent to file writ petition. Father, however, did not file a writ petition, and the matter was deemed a nonoperative writ in May 2023.

Father did not acknowledge the bar of section 366.26, subdivision (l), in his opening brief. Nor did he file a reply brief to dispute DCFS's contention that he cannot challenge the February 1, 2023, denial in his appeal from the December 5, 2023, orders. Father has forfeited a claim of error by not challenging the February 1 denial of his request for a bonding study in a petition for extraordinary writ as required. (§ 366.26, subd. (l); *In re Merrick V.* (2004) 122 Cal.App.4th 235, 247 ["All court orders . . . made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ"].)

3. *The Juvenile Court Did Not Abuse its Discretion in Denying the December 5, 2023, Request for a Bonding Study*

Father argues the juvenile court abused its discretion by denying his December 5, 2023, request for a bonding study because the court relied solely on the description of visits between August and November 2023 in making its decision. The

---

otherwise not decided on the merits." "Failure to file a petition for extraordinary writ review within the period specified by rule, to substantively address the specific issues challenged, or to support that challenge by an adequate record *shall preclude subsequent review by appeal of the findings and orders made pursuant to this section.*" (§ 366.26, subd. (l)(2), italics added.)

juvenile court denied father's request because it found "there [was] an abundance of information in the reports," and it did not believe a bonding study was required.

Monitored visits were ordered for father in December 2019. There is ample evidence in DCFS's reports about the quality and nature of father's relationship with J.G. The reports contained detailed summaries of father's visits with J.G. along with notes and comments from different monitors, J.G.'s caregivers, and J.G.'s therapist discussing visits prior to August 2023. When "the parent and child have been in the dependency process for 12 months or longer, . . . the nature and extent of the particular relationship should be apparent. Social workers, interim caretakers and health professionals will have observed the parent and child interact and provided information to the court." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Further, the court admitted the stipulated testimony of paternal grandmother concerning the visits she monitored, which took place from at least September 2021 to July 2023. The court also admitted the stipulated testimony of J.G. in which she stated she loved father. To the extent father complains the reports lacked sufficient detail of visits prior to August 2023, he fails to explain why he could not have obtained additional evidence about such visits through other means, such as his own testimony.

Father contends the juvenile court erroneously found he should have made his request for a bonding study earlier, when in fact he did request a bonding study at the February 1, 2023, hearing. However, father did not reassert his request for a bonding study at the ten hearings since his prior request was denied. Moreover, father does not address the court's concern about the delay that granting the December 5, 2023, request

16

would have caused.  The court had continued the December 5 hearing seven times, and father's counsel represented father would be ready to proceed.  The court did not err in refusing to further delay permanency for J.G. by ordering a bonding study. (See *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197 ["Bonding studies after the termination of reunification services would frequently require delays in permanency planning"]; see also *In re Emily L.* (1989) 212 Cal.App.3d 734, 743 [continuances in juvenile court are disfavored].)

Based on the foregoing, we conclude the juvenile court could have "reasonably refrained from ordering a bonding study." (*In re Lorenzo C.*, *supra*, at p. 1341.)

**B.    The Juvenile Court Did Not Err by Finding Father and Mother Failed to Satisfy the Parental-Benefit Exception**

Mother and Father each argue the juvenile court erred in finding the parental-benefit exception did not apply.  We disagree.

1.    *Legal Principles and Standard of Review*

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.'"  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  Once the juvenile court terminates reunification services and determines a child is adoptable, the court must select adoption as the permanent plan and terminate parental rights unless it finds doing so would be detrimental to the child under a specified statutory exception.

17

(§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 630–631 (*Caden C.*); see *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker'"].)

One of these exceptions is the parental-benefit exception, which applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The three elements the parents must prove to establish the exception are: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

"A substantial evidence standard of review applies to the first two elements" of the parental-benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) The factual bases on which the juvenile court determines detriment under the third element are subject to substantial evidence; the ultimate weighing of facts and determination of detriment is subject to abuse of discretion. (*Id.* at p. 640.)

"When reviewing for substantial evidence, ""we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.""" (*In re A.P.* (2024) 103 Cal.App.5th 1137, 1142 (*A.P.*).) Where, as here,

18

parents contend the court erred in finding they did not meet their burden of proof, we must determine whether "the evidence compels a finding in favor of the appellant[s] as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4, 1010, fn. 7.)

Here, the first element of the parental-benefit exception is not in dispute, as the juvenile court found mother and father each met their burden to show regular visitation. Mother and father argue the juvenile court erred in finding they did not satisfy the second element and abused its discretion in finding that termination of their parental rights would not be detrimental to J.G. and J.V.

"[For] the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Ibid.*) "'[A] parent must demonstrate something 'more than frequent and loving contact, an emotional bond with the child, or pleasant visits.'" (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 318–319.) "'[F]or the exception to apply, the emotional attachment between the child and parent must be that

of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.'" (*Id.* at p. 319.)

Concerning the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court must look to the effects on the child from severing the relationship, which might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. [On the other hand,] a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*)

### 2. *Mother Does Not Show the Juvenile Court Erred*

Substantial evidence supports the juvenile court's finding that continuing J.G.'s and J.V.'s relationship with mother would not benefit the children. At the time of the section 366.26 hearing, J.V. was 16 years old. He did not object to the termination of parental rights. (See § 366.26, subd. (c)(1)(B)(ii) [a child 12 years of age or older may object to termination of parental rights].) J.V. reported he had no desire to go back to living with mother and wanted to live with his maternal aunt M.M. because he knew mother could not care for all her children. After reunification services were terminated, he stated he wanted to be adopted by M.M. This is evidence J.V. lacked a substantial positive emotional attachment to mother.

J.G. was three years old when she was detained from mother in November 2020 and spent the next three years out of mother's care. There was evidence that mother slept during

20

visits with J.G. and J.V. When mother had overnight visits, she left the children with maternal grandmother while she went elsewhere and did not return for a day or two. When mother missed or did not show up for visits, there were no behavior changes in the children.

In arguing that she established the children would benefit from continuing a relationship with her, mother points to the "quality" of visits "enhanced by the insights and tools she acquired from services she received." However, mother does not cite to any evidence in the record that supports her argument. (*In re S.C.* (2006) 138 Cal.App.4th 396, 406–407 ["When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited"].)

Mother further argues the juvenile court abused its discretion by not selecting legal guardianship as the permanent plan given her consistent visitation and seven months of sobriety. However, mother cites no authority to support her argument. She, thus, forfeits the contention. (*County of Butte v. Emergency Medical Services Authority* (2010) 187 Cal.App.4th 1175, 1196, fn. 7 [contention not supported by citation to legal authority is forfeited as improperly presented].)

3.    *Father Does Not Demonstrate the Juvenile Court Erred*

Substantial evidence supports the juvenile court's finding that J.G. did not have the type of beneficial relationship with father that warranted continuation. J.G. was two years old when

21

she was detained from father.  By the time of the December 2023 section 366.26 hearing, she was six years old and had spent two thirds of her life out of father's custody.  In the more than four years between detention and the section 366.26 hearing, father had only monitored visits with J.G.  This weighs against finding J.G. would benefit from continuing her relationship with father. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632.)

In making every inference in favor of the order, there was also evidence father's visits had a negative impact on J.G.  The record indicates J.G. would urinate on herself during visits with father, which J.G. attributed to father's tickling.  When J.G.'s therapist asked her about these incidents, her therapist noted J.G. was open in discussing other topics but obscure in discussing father and visits.  The therapist tried to speak with J.G. about the incidents again a short time later, but J.G. remained vague about visits.

When visits moved from paternal grandmother's home to DCFS's office, J.G. repeatedly asked father about paternal grandmother and cried heavily because she wanted to see her. J.G. made her preference for grandmother clear when she said, "'I choose grandma.'"  J.G.'s caregiver also reported that in between visits, J.G. would not ask about father but would ask about paternal grandmother.  This evidence suggests J.G. developed a strong bond with paternal grandmother, unlike her bond with father, to whom  J.G. would say goodbye at the end of visits without issue.  (See *In re I.E.* (2023) 91 Cal.App.5th 683, 692 [evidence that the "child experienced no distress at the end of visits . . . tends to support the juvenile court's conclusion that the relationship was not so substantial that its severance would be detrimental to the child"].)

In addition, a few weeks before the section 366.26 hearing, J.G.'s caregiver expressed concerns with father encouraging J.G. not to do what she was told in her placement home. When J.G. would not talk or visit with father on a given day, J.G. would follow directions and her daily routine without issue. J.G.'s therapist reported J.G.'s caregiver's structure benefitted J.G. in meeting her goals; however, father disrupted her progress because he did not set adequate boundaries for her behavior. J.G.'s therapist stated that if father's poor boundaries for J.G. were removed, J.G.'s behaviors would improve.

In arguing no substantial evidence supports the juvenile court's finding, father primarily focuses on the positive aspects of his visitation and takes issue with a particular social worker's reports of his visits. But in reviewing the juvenile court's ruling, we cannot reweigh the evidence or make credibility determinations. (*A.P.*, *supra*, 103 Cal.App.5th at p. 1142.) "[F]requent and loving contact . . . is [not] sufficient to establish the 'benefit from a continuing relationship' contemplated by the statute." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418; see *In re Katherine J.*, *supra*, 75 Cal.App.5th at pp. 318–319.) Thus, father does not show the evidence compels finding a beneficial relationship as a matter of law. (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

Because father does not show the juvenile court erred in assessing the second prong of the parental benefit exception, we do not need to analyze the third prong: whether it would be harmful to J.G. to sever the parental relationship with father in favor of adoption. Nevertheless, father's recitation of evidence showing positive aspects of his visits does not establish the juvenile court abused its discretion. (*Caden C.*, *supra*, 11 Cal.5th

23

at p. 641 ["A court abuses its discretion only when """the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination""""].) Father does not show harm caused by terminating the parental benefit would outweigh the benefit J.G. would receive from the security and stability of adoption, was arbitrary, capricious, or patently absurd.

## C. Father Does Not Demonstrate DCFS Failed to Conduct an Adequate Inquiry as Required by ICWA

Father contends the juvenile court and DCFS failed to fulfill their duty of initial inquiry under ICWA. Specifically, father asserts the court did not ask him or mother about Indian ancestry at their first appearances or instruct them to provide subsequently gained information. He also asserts DCFS made no inquiry of paternal grandmother. DCFS argues the juvenile court's finding that ICWA did not apply is supported by substantial evidence, as DCFS repeatedly inquired about mother and father's Indian ancestry and the court directly asked father and paternal grandmother about their Indian ancestry. We agree with DCFS.

Congress enacted ICWA "to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children 'in foster or adoptive homes which will reflect the unique values of Indian culture.'" (*In re Levi U.* (2000) 78 Cal.App.4th 191, 195, superseded by statute on another ground as stated in *In re B.E.* (2020) 46 Cal.App.5th 932, 940; see also 25 U.S.C. § 1902.) Whether ICWA applies depends on

24

whether the child who is the subject of the custody proceeding is an Indian child.[8]  (*In re Abbigail A.* (2016) 1 Cal.5th 83, 90.)

"Under ICWA's state analogue, the California Indian Child Welfare Act (Cal-ICWA; [citation]), courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1125; § 224.2, subd. (a).)  "The continuing duty to inquire whether a child is or may be an Indian child 'can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.'" (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552.)  The duty of initial inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subds. (a), (b).)  "While this duty of inquiry is sometimes referred to as the initial duty of inquiry, this is a bit of a misnomer, as the duty 'continues throughout the dependency proceedings.'" (*Dezi C.*, *supra*, 16 Cal.5th at p. 1132.)

"'"[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if

---

8      An "Indian child" is a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.  (§ 224.1, subds. (a), (b); 25 U.S.C. § 1903(4).)  "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1, disapproved on other grounds in *In re Dezi C.* (2023) 16 Cal.5th 1112, 1152, fn. 18 (*Dezi C.*).)

reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance."'" (*In re H.B.* (2023) 92 Cal.App.5th 711, 719.) A court's finding that ICWA does not apply is "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) The court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

In this case, the juvenile court's finding that ICWA did not apply is supported by substantial evidence. In December 2019, father, who was born in Mexico, signed an ICWA-020 form denying any Indian ancestry. The court acknowledged receipt of father's ICWA-020 form at the hearing on mother's temporary restraining order request in December 2019. Father also denied Indian ancestry on multiple occasions when DCFS inquired.

The juvenile court also inquired about father's Indian ancestry, at DCFS's counsel's request, at the initial section 366.26 hearing on July 28, 2023. The court asked paternal grandmother about her Indian ancestry at the same hearing.

Regarding mother, mother filed an ICWA-020 form denying Indian ancestry, which the juvenile court acknowledged receipt of on the record. As with father, mother denied Indian ancestry on multiple occasions. DCFS also inquired of three maternal aunts and of maternal grandmother, all of whom denied Indian ancestry. The parties identify no other extended relatives that should have been asked about any Indian ancestry.

26

In sum, substantial evidence supports the juvenile court's finding that the inquiry was adequate and ICWA does not apply. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

## DISPOSITION

The juvenile court's orders are affirmed.


MORI, J.

We concur:


CURREY, P. J.


ZUKIN, J.